The plaintiff is a young man who was actively engaged as a farmer in the Parish of Terrebonne. His operations were not *Page 26 
extensive. He cultivated about twenty-five acres of land mostly in sugar cane and, as shown by his testimony and that of other witnesses, performed practically all the services incidental thereto himself.
He had been making and harvesting a crop of sugar cane for seven or eight years and with the exception of two years back in 1938 and 1939 or 1939 and 1940, when he delivered his crop to the Magnolia Co-Operative, he sold and delivered it all to the defendant herein, Realty Operators, Inc., and it was ground at their Southdown factory near Houma, Louisiana. He had no written contract but we think we can assume that it was the usual contract involving the sale of sugar cane by a farmer to a sugar factory, in which the purchaser pays for the cane at so much per ton based on the sucrose content of the cane, furnishing its own trucks or railway equipment to take and haul the cane from where it is unloaded by the grower at some hoist or derrick most convenient to him, and transported to the factory. The buyer also pays a small charge, usually ten cents per ton, known as loading charges, when the seller hoists and unloads his own cane.
The plaintiff had been in the habit of, and in the year 1942, was using a hoist situated on the property of Mrs. Alfred Bergeron which was under lease to Norris Breaux, in order to unload his cane, and from there it was taken by the defendant in its trucks to the factory at Southdown. Norris Breaux cultivated a crop of sugar cane on the Bergeron property which he also sold to the defendant but it seems that it was more convenient for him or for the defendant company for him to ship his cane by railroad from some other point, and he did not therefore use the hoist on the property cultivated by him. The hoist was operated by motive power and the Ford motor which was used to operate it belonged to Breaux who also furnished the gasoline with which to run it. Although in this case the plaintiff himself, as did any grower who used the hoist, operated it in unloading his cane and the check for the unloading charges was made to him, nevertheless the ten cents per ton was turned over by him to Breaux, the reason for that being that the expenses of gasoline and use of the motor had to be reimbursed and that was why Breaux received the amount of ten cents per ton.
In November, 1942, the plaintiff began to deliver his crop of cane at the hoist on the Bergeron property, unloaded several wagons on November 22, the day on which he started, and on the following day, at about eleven o'clock in the morning, when he was using the hoist, an accident happened when it broke and he sustained an injury to his back. As a result he has instituted this suit to recover a large sum from the defendant as damages.
The basis of his suit is that the defendant, whilst it did not itself own and operate this hoist, took complete charge and control of it as in fact it did of all the hoists and derricks of numerous farmers and cane growers who sold their cane to it, kept and maintained the same in repair, inspecting them each year, making all necessary adjustments and repairs and besides that having, in this case, given plaintiff specific instructions to use this particular cane hoist at which he was injured. After setting out all these facts, the plaintiff alleges that the defendant's agents and employees who made the inspection and repairs to the hoists used by the cane growers selling their cane to it, failed to properly examine this particular cane hoist, leaving it in a decayed and rotten condition which made it totally unfit for use and that its said condition was not apparent to him as he is a farmer and unskilled in such matters. His demand is for the total sum of $42,083.27, the larger items being for physical and mental pain and suffering incidental thereto. He had claimed $1,200 for injury to his ribs but there was no testimony to support the claim and we note that it has been abandoned.
The defendant, in its answer, after admitting those allegations which it could admit without involving itself into any liability denies all other allegations either specifically or from want or lack of sufficient information.
The trial lasted several days and the record is very voluminous. The trial judge did not assign written reasons for judgment. *Page 27 
The decree, based on oral reasons, as stated, is one rejecting the plaintiff's demand and dismissing his suit. The plaintiff thereupon took this appeal.
[1, 2] As we view it, the question to be considered in the case is what legal duty, if any, did this defendant owe the plaintiff as a result of the contract between them for the sale of his cane with necessary use of a hoist at which to unload it, and consequently its liability for any negligence that may be found to have existed in the condition of the hoist, by reason of which he was injured. The question may be said to involve three points: First, the responsibility assumed by the defendant in maintaining the hoist, although it was situated on another's property, in good working order and condition, second, the authority, either direct or implied, which it gave plaintiff to use the derrick, and third, the negligence, vel non, of its agents or employees in failing to properly inspect it and make proper and necessary repairs. Defendant did not plead contributory negligence and as that is a matter which has to be specially pleaded it cannot be considered. Counsel for plaintiff protected himself on this point at all stages of the trial. After trial defendant filed a plea of estoppel based on a warning which it claims the plaintiff had been given by a party who was working around the derrick but this plea appears to us to be nothing more than a plea of contributory negligence and it neither should be considered.
[3] Plaintiff attempted to prove what was the custom of this defendant in the years past with regard to inspecting and maintaining all the hoists situated on properties other than their own and at which cane delivered to it was hoisted. The trial judge consistently refused to admit testimony of this general character and limited the proof of such custom to the particular derrick involved in this case. The ruling of the trial court is a bit doubtful, in our opinion, as we believe that plaintiff had the right to prove, if he could, what was the general custom of this defendant in regard to what it did in inspecting and maintaining all derricks other than those on its own properties and from which they derived the benefit of having cane delivered to it by the growers who sold to them. In spite of the ruling, there did creep into the record some testimony showing that it had been their custom in the years past to inspect and take care of such hoists and as a matter of fact it does not seem to be disputed seriously by defendant's officers and its agents and employees that it did annually inspect them all, maybe more than sixty in number, and invariably made all necessary repairs. It is very positive that with regard to the hoist involved in this case they made such inspections and had not only inspected it during the summer but the day before plaintiff started to use it had taken the motor to its factory at Southdown to put it in good working condition and had brought it back and installed it. The testimony on the point is such as to lead us to conclude that this plaintiff, as well as all of the growers who delivered cane to the defendant, depended upon the defendant to see that the hoists were in proper working order and condition and this, under the custom which had prevailed over a period of years they had a right to expect.
[4] The defendant's contention seems to be that as to the hoists on properties of strangers it had no contractual relation in regard to those people who used them, and that it was merely a matter of convenience for the growers and cane sellers that it maintained them in good condition. We would say rather that on account of the contract it had with the cane sellers, which although not specifically so providing, no doubt contemplated that they should have the use of a hoist or a derrick to unload their cane, that no matter where a particular hoist was situated, when, with the apparent consent of the owner of the property on which it was situated, it undertook to maintain it and keep it in proper condition, defendant assumed a responsibility toward those sellers and became liable to anyone who might be injured because of any defective condition in the hoist. These hoists were in the nature of things that were in the custody of the defendant and under the terms of Article 2317 of the Civil Code, they became responsible for damages occasioned by them. That Article *Page 28 
states that its terms are to be understood with certain modifications which appear in subsequent articles with regard to the liability of parents and tutors, masters and teachers, etc., none of which apply in this case. We construe the Article to mean by things in one's custody, such things over which that person maintains some sort of supervision and control either because he has an interest in them or derives a benefit from their use. If he did not need them naturally there would be no reason for him to maintain them in proper condition. But when, as in this case, he inspects a thing regularly and repairs it when repairs are needed, he, in our opinion, assumes a responsibility for its good working order and condition and makes himself liable to anyone who may be injured by reason of his negligence in failing to do the repair work properly.
[5] The next point is the one concerning the authority of the defendant in this case to have directed the plaintiff to use this particular hoist and on this point the testimony favors the plaintiff. He himself testified that when the time came for him to know where he would hoist his cane that year, he saw Mr. Elliott Jones, manager of the defendant's property and asked him specifically what hoist he was to use. He says Mr. Jones told him to use this hoist on the Bergeron property. Mr. Jones' testimony on this point is of a rather negative character. He says he does not recall the exact conversation he had with the plaintiff on that occasion but feels pretty sure that he told him to go and see Norris Breaux about the matter because, he says, the defendant had no right to instruct anyone to use somebody else's hoist. We believe that the plaintiff's recollection of this conversation is better than that of Mr. Jones' for two reasons: First, it was a matter of utmost importance to him where he was going to hoist his cane; in fact that was the one thing he had in mind, whereas Mr. Jones, with the multifarious duties he had to attend to probably taking care of a large number of sugar growers and their hoisting facilities, was not impressed as strongly with the conversation as was the plaintiff. Second, the plaintiff recalls another detail of that conversation which is very material to this point. He says that in the conversation he complained to Mr. Jones about the motor not running well, whereupon Mr. Jones told him that he would send a mechanic to see about it. The proof further shows that a mechanic did come either that same day or the next and the motor was attended to.
But even if the plaintiff was not specifically instructed that day, as he says he was, to use the Breaux hoist, the testimony leaves no doubt that the defendant knew that that was the hoist he had used in the past years during which he had delivered his cane and we feel sure that it knew also that he had started to use that same hoist to save his crop of 1942. Defendant was bound to know this for the reason that when the cane was unloaded at the hoist, its own trucks came to pick it up there and certainly some record had to be kept of the cane it received and where it came from.
[6] We conclude therefore that on these two points the case is with the plaintiff. We note in brief of his counsel that it is stated that that was the finding of the trial judge as given in his oral reasons. Whilst that is not a matter of record it is not contradicted in brief of counsel for the defendant. If it was so then it must be, as also stated by counsel for plaintiff, the trial judge was not satisfied that plaintiff had shown negligence on the part of the defendant in inspecting and keeping this hoist in repair.
If that was his finding on this point we cannot agree with him because in our opinion the preponderance of the evidence is that this hoist broke down because of the defective condition of the mud sill, one of the important pieces of timber by which it is operated. Plaintiff at the time of the accident was operating the motor which lifted the load of cane and it was while this operation was going on that all of a sudden the mud sill broke off next to a bolt by which it was attached to a dead man or stiff leg and there is really too much testimony in the record to leave any doubt that it broke off because the timber out of which it was made was rotten. It *Page 29 
fell on the back of the plaintiff and caused him to sustain the injury he complains of. There is no other reason which caused it to break unless, as seems to have been suggested, plaintiff was trying to lift too heavy a load. Defendant's own records were produced however and these show that the loads did not weigh two tons and one-half and that is what the capacity of the hoist is said to have been. There is other testimony to the effect that the cane had been piled too high around the king pole and maybe that had weakened it, but such proof is far from being sufficient to show that that was a cause for the breaking of the mud sill. Defendant's witnesses claim that in the inspections made by them in the summer time they were bound to have detected any defective condition in the timber but the fact remains that this mud sill did break and it broke because, as the proof shows, it was rotten.
[7] If, as already stated, the plea of estoppel amounts to no more than a belated plea of contributory negligence which cannot be considered, then the remaining question in the case has to do with the amount of damages plaintiff is entitled to recover unless the point raised in brief of counsel for defendant to the effect that in using the hoist and operating it himself, he took all the risks that were involved in its condition of repair and in its operation. The argument presented on this point seems to imply a plea of assumption of risk and there again counsel is met with the proposition that that is a special defense which has to be specially pleaded. See Lewis v. Texas Pacific Railway Co., 146 La. 227, 83 So. 535. This, defendant did not do and that defense, as presently urged, cannot be entertained.
[8] The proof is rather positive that plaintiff sustained a compression fracture of the sixth, seventh and eighth thoracic vertebrae and that he has been left with a definite back injury. It is however, in our opinion, a typical case of back injury and with the conflicting medical testimony found in the record, it is difficult, as usual, to arrive at exactly the extent of the residual physical damage.
Plaintiff was taken to the Ellender Sanitarium in Houma the same day he was injured and remained there only a few days, as, he claims, his means did not permit him to stay there longer. However, he was out and about for a couple of weeks and was afterwards seen by Dr. R.W. Collins who advised him that he should have institutional treatment. He went to Charity Hospital in New Orleans, going there by bus. He was carefully examined and a diagnosis made of his case. An operation was suggested but he was afraid to take the chances that were involved and preferred to adopt a treatment which requires using a brace to support his back. This no doubt helps him but he still complains that he cannot do the heavy work a farmer is called on to perform at times. The testimony on this point is conflicting. It is shown however that he goes out hunting and if he can indulge in that sort of sport it would seem that he can do some sort of work. Dr. Willard Ellender of Houma classed him as being seventy-five per cent disabled and Dr. Fred Stuttle of Charity Hospital, fifty per cent. He is still a young man and there is testimony to the effect that he may, in time, recover entirely. His earnings were not large as indicated by the rather small tonnage of cane he made and sold each year. He has a family but according to his own testimony he lives alone and his children live with their grandparents. Taking all these facts and circumstances into consideration we have concluded that an award of $4,000 for his loss of earning power and for his pain and suffering would about compensate him for the injury he has sustained. In addition he is also entitled to recover the sum of $83.27, actual expenses he either paid or incurred by reason of his injury.
For the reasons stated, it is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby set aside, annulled and reversed, and it is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Morris Bonvillain, and against the defendant, Realty Operators, Inc., in the full and entire sum of $4,083.27, with legal interest from date of judicial demand, and all costs of these proceedings. *Page 30