This suit arises from an automobile collision which occurred on January 2, 1945, at about 2:50 o'clock, p.m., in the City of New Orleans. The plaintiff wife sued for $35,000.00 to compensate her for personal injuries, and the plaintiff husband sued for $1,210.75, the medical and other expenses incurred in the treatment of his wife, and for damages sustained to his automobile. Both plaintiffs reside in New Orleans.
William R. Baird was driving his automobile down Carondelet Street with his wife as a passenger. He stopped at Howard Avenue pursuant to a red light, when an automobile, owned by a partnership known as Rosenthal and Mathis, and driven by Frank Alexis, its employee, came from behind and struck the rear bumper of the Baird automobile.
This suit is directed against The Employers' Liability Assurance Corporation, Ltd., the insurer of the partnership's automobile. There is a stipulation by counsel in the record to the effect that defendant was the insurer of the "accident," and that the liability limits of the policy exceed the amounts sued for. Counsel further stipulated that William R. Baird "may show medical bills and expenses in excess of the amount sued for in the petition without the necessity of amendment, though liability therefor is denied."
Upon a trial below, Mr. Baird recovered $3,516.73 and Mrs. Baird was awarded $12,000.00. Defendant has appealed suspensively from the judgment.
Defendant's counsel admitted that this is a case of liability. Therefore, the only questions to be resolved are, whether Mrs. Baird was injured in the accident, and, if so, the quantum to be allowed to plaintiffs.
The record shows that Mrs. Baird was thrown forward and then back by the impact, and immediately felt a terrific lightning-like pain across her shoulder. After the accident, the Bairds continued on to the *Page 671 
Union Station at Howard Avenue and South Rampart Street, where Mr. Baird was to board a train for Chicago, and his wife took over the driving of the car. The lightning-like pains seem to have subsided, and Mrs. Baird experienced no further pain until the following day.
Mrs. Baird formerly resided in Meridian, Mississippi, and testified that she visited that city from time to time. On the day after the accident she departed for her former home, but before the bus "got out into the country" she started to have "terrific pains" in her shoulder and neck, which continued throughout the trip. When she arrived at Meridian, her left shoulder was swollen and the muscle had a "big knot" on it.
Mrs. Baird was unable to see a doctor in Meridian and did not secure the services of a physician until she returned to New Orleans, when she visited Dr. J. T. Sanders on January 17, 1945. She was treated by several other physicians, and finally submitted to an operation by Dr. R. E. Semmes, of Memphis, Tennessee, on December 3, 1947.
Numerous X-ray pictures of Mrs. Baird's neck were made, and the physicians are almost unanimous in their views that these plates showed degenerative hypertrophic changes or arthrosis, which condition, we are led to believe from the medical testimony, would be not uncommon in a person forty-eight years old, which was Mrs. Baird's age.
Dr. Sanders gave diathermic treatments which did not improve the patient's condition, and then referred her to Dr. Gilbert C. Anderson, who saw her first on February 2, 1945. He found Mrs. Baird suffering from pain and the loss of power in her left hand. His thought was that she had some pressure on a nerve root caused by a ruptured disc. Dr. Anderson referred Mrs. Baird to Dr. Frank Brostrom, an orthopedic surgeon, and later concluded that operative procedure was necessary and referred her to Dr. Semmes of Memphis.
Dr. Brostrom was deceased at the time of the trial. Two of his reports, however, outlining his treatment, are in the record and were admitted into evidence without objection. He had Mrs. Baird admitted to Touro Infirmary in New Orleans, and according to his reports (and also according to the testimony of Dr. Anderson) traction treatment was applied, which is a stretching to relieve pressure. This procedure was described by Dr. Anderson as: "A halter is applied to the patient's head in such a way as to afford as little discomfort as possible, and from this apparatus a line is carried over a pulley attached to the head of the bed, and on that line is hung a weight."
This first traction was given for a period of about three weeks, while the patient lay in a bed on a thin mattress; the traction weights were increased until they totalled fifteen pounds.
Mrs. Baird testified regarding this treatment and stated that it was very painful. Upon being released from the hospital she was fitted with a neck brace, and slept for a month at her home in the same traction arrangement. During this period she was treated both by Dr. Anderson and Dr. Brostrom. She had one spasm attack in her neck and Dr. Brostrom suggested that she be placed back into traction, but she refused, because that operation was too painful. However, she stated that when her condition failed to improve she again submitted to traction on January 6, 1947, at Riley's Hospital in Meridian, Mississippi, under the care of Dr. Gus A. Rush, Jr., a physician of that city.
Dr. Rush testified that he had known Mrs. Baird all of his life, and that while he was in New Orleans on November 25, 1945, he observed at once that something serious had happened to her, as when he had last seen her she was a most pleasant normal individual, but that she had become restless and complained of intense pain in the shoulder, and of her inability to even stand the weight of a light coat. He noticed that she constantly massaged the fingers of her left hand, and that there was a slight limp involving her left leg.
Dr. Rush did not again see Mrs. Baird until she was admitted to the hospital at Meridian, for in the meantime she was still under the treatment of Drs. Brostrom and Anderson. Mrs. Baird was again placed *Page 672 
into traction, and upon being relieved from it a cast was applied to her neck and shoulders, but had to be immediately removed because of the intense pain caused by it. Dr. Rush then attempted to alleviate the pain by the use of Novocain injections, which were only temporarily helpful; one of these injections caused the patient a severe drug reaction, which necessitated the use of another type of injection. Dr. Rush's opinion was that Mrs. Baird's condition was due directly to trauma.
Mrs. Baird's condition failed to respond to any of the treatments and showed no improvement whatever, and Dr. Rush then recommended surgery. He suggested a consultation with Dr. Semmes, a neurological surgeon, at Memphis. Dr. Semmes operated upon Mrs. Baird on December 3, 1947, at Baptist Memorial Hospital in Memphis. When he first examined her she had a stiff neck, pain in the shoulder, left arm, forearm, index finger, and in the thumb of the left hand, and also complained of tiredness in the left leg with a turning in of the left foot, and he estimated about a fifty per cent loss of power in the left hand. His diagnosis was that the patient had a ruptured disc, which he characterized as very painful. The operation which he performed is classified as a major one; it consisted of laying open the back of the neck and exposing the spine and the left side of the interspaces.
Dr. Semmes removed some bone and ligaments, and the nerve roots were exposed in the interspaces, notably the sixth and seventh nerves. These he found to be compressed, flattened, adherent, and atrophied. He testified that he found two ruptured discs, between the fifth and sixth and between the sixth and seventh vertebrae, which he corrected.
Dr. Rush, the Meridian physician, attended the operation at Memphis, and testified as to the existence of the ruptured discs.
Two medical expert witnesses were produced by the defendant.
Dr. Rufus H. Aldridge of New Orleans testified that he examined Mrs. Baird on February 13, 1948, and made a study of the X-ray plates. Referring to the plates of January 17, 1945, he gave the opinion that these disclosed degenerative or destructive process between the fifth and sixth cervical vertebrae, with some narrowing of the disc between them, and also possibly between the sixth and seventh vertebrae. He noticed these changes also in the other X-rays and thought they were of some time standing, possibly for as long as a year prior to the dates the X-rays were made. He advanced the opinion that the condition which he found would ordinarily be found in a person past the age of forty-five. Dr. Aldridge's explanation of these hypertrophic changes was, "spurring or pointing of the edges of the vertebral body."
The other defendant expert, Dr. Lyon K. Loomis, ordered X-rays, and examined Mrs. Baird on March 6, 1947. The plates, according to his testimony, showed "negative with the exception of some hypertrophic changes of the bodies of the fifth and sixth cervical vertebrae," but he stated that he was unable to find any definite evidence of an injury. His interpretation of the first X-rays taken, i. e., those of January 17, 1945, was that they showed essentially the same condition, and he believed that the hypertrophic changes could have existed for as long as twelve months prior to the date of the pictures.
Concerning the X-rays of January 17, 1945, the report of Dr. Magruder, who made them in New Orleans, was that they were negative for fracture, but showed fusion between the bodies of the fifth and sixth vertebrae, an old lesion. The gist of the report of Dr. Teitelbaum, who later made X-rays, was that degenerative arthrosis of a moderately advanced degree appeared, but that there was no other significant abnormality demonstrated.
Counsel have argued pro and con as to the findings of the various physicians. Counsel for defendant argue that the medical evidence unmistakably shows that the hypertrophy or degenerative arthrosis was of long standing predating the accident, and that the condition was one which would ordinarily be found in a person of Mrs. Baird's age, and that the complaints, therefore, cannot be attributed to the automobile accident. Counsel point out that Dr. Semmes *Page 673 
had never been shown the Magruder X-rays of January 17, 1945, nor had he been made acquainted with the Magruder report which recited that the pictures showed an old lesion, and contend that if Dr. Semmes had been given the benefit thereof he probably would not have formulated any other opinion but that Mrs. Baird's troubles antedated the accident.
However, counsel overlook entirely the testimony of Drs. Teitelbaum and Anderson to the effect that a disc rupture is not necessarily always to be seen on an X-ray plate. They also disregard the testimony of Dr. Semmes and Dr. Anderson to the effect that their diagnoses were that the patient's condition was due to a ruptured disc.
But regardless of what the X-ray showed, we have the positive testimony of Dr. Semmes that he found and corrected two ruptured discs, and also the equally positive testimony of Dr. Rush, who witnessed the operation, that such condition existed.
When considering all of the testimony, to which we have given the most careful study, there is no doubt in our minds that Mrs. Baird's symptoms were caused by the ruptured discs. Neither can there be doubt that the condition emanated from the automobile accident. Dr. Rush testified that he had been in the armed service during the late war and had considerable experience with accidents of a similar character, in which members of the armed personnel had been thrown forward in aircraft, sustaining "a rupturing of the cartilagenous disc between the vertebrae within the neck or lower back region with escaping of the gelatinous nucleus pulposus which dislocated itself around the nerve roots or cord of the affected area," and that he believed Mrs. Baird's condition was caused by the accident of January 2, 1945. Dr. Semmes' opinion was that what he found at the operation would not only be consistent with the happening of the accident of January 2, 1945, but that an automobile being struck in the rear by another car is exactly "the type of injury which does cause ruptures of the intervertebral discs, and I have seen a number of cases which have resulted because of such an accident." Dr. Loomis, one of the defense experts, admitted "it is very possible that this woman could have sustained a neck injury at the time of her accident."
There is some conflict in the evidence as to whether the impact between the automobiles was violent, but we do not believe that such detail is important or is necessary to be resolved, for the reason that it is well known that when two automobiles collide suddenly, even though lightly, an unsuspecting occupant in the forward automobile will experience a jolting of the head and neck.
Before her injuries, according to Mrs. Baird's testimony, she was a healthy normal person, and her symptoms appeared simultaneously with the accident and continued thereafter, even down to the date of the trial below. When testifying, she still complained of pain. She was formerly a healthy and athletic person, and indulged in such sports as swimming, golfing, and badminton, in which she is unable to engage at the present time. The operation has partially relieved the pain in her neck, but on frequent occasions she still suffers. The movement of her left arm is restricted and she has little use of that member, to such an extent that she cannot hold dishes, wring clothes, carry packages or a handbag. She lives very cautiously, because of the admonition given her by Dr. Semmes that her neck is vulnerable and another injury would be fatal.
Mr. Baird corroborated his wife's testimony in considerable detail. He also testified as to her good disposition and pleasing personality previous to the accident, and contrasted it with the change that took place after the injuries. He described her as having been transformed into a nervous and irritable person who continually complains of pain.
According to Dr. Rush, Mrs. Baird will never recover the full and normal use of her left arm, and can never be assured of complete relief from pains. Dr. Semmes stated that in a few months she would know better of the results of the operation. However, it was his belief that her intervertebral joints will not return to normal, nor will the changes in the nerves, as they are probably largely irreversible. He expressed *Page 674 
the positive opinion that her neck is very vulnerable. None of the defense experts examined Mrs. Baird after the operation, and there is no contrary evidence tending to show that she has not suffered permanent injuries.
Mrs. Baird underwent prolonged and severe treatments for almost two years, which included extended traction on two occasions, the wearing of a neck brace, and submission to a major operation. She was hospitalized on three different occasions. During the whole period she claims to have suffered intense pain and mental anguish. The experts classified her condition as being of a painful type.
The trial judge assessed $12,000.00 for the injuries, which defendant's counsel argue is excessive, citing the cases of Bonvillain v. Realty Operators, Inc., La. App., 26 So.2d 25, and Burke v. Toye Bros. Yellow Cab Co., La. App., 28 So.2d 369. A reading of those cases, however, shows that the injuries were not nearly as severe as those suffered by Mrs. Baird, nor did either of those plaintiffs undergo such an extended and painful course of treatment, and we think that the cited cases should not be employed as criteria here. We are well aware that most plaintiffs in physical injury cases are usually prone to exaggerate in expressing their suffering and injuries. However, we have given the most careful consideration to the record and it is convincing that Mrs. Baird was seriously hurt, suffered intense pain, and is permanently injured, and it is our opinion that the award should not be disturbed. In the assessment of damages for personal injuries, much discretion must be left to the court, as no rule obtains and no standard exists for measuring such damages, and all circumstances being considered there is no manifestation that there was any abuse of discretion by the trial judge.
As to Mr. Baird's claim for $15.00 to cover damages sustained to his automobile, the same must be disallowed, as there is no proof in support thereof. He also presented an itemized statement, accompanied by receipted bills and vouchers, for $3,501.73 for expenses, which is largely made up of physicians' fees, hospitalization, costs of nurses, X-rays, etc. His testimony is that all of the items shown on the statement were necessary in connection with Mrs. Baird's treatment, and that he paid them, however, with the exception of one physician's charge which had not been paid for the reason that he had never received a bill from the doctor, but that he intended to pay this bill upon its receipt.
It is argued by defendant that the medical and other expenses are out of proportion to the injuries, and that Mr. Baird made no attempt to minimize the expenses, but on the contrary sought to build up excessive charges. We see nothing in the record to indicate such, with the possible exception of the bill of Dr. Rush for $100.00 for his expenses of travelling to Memphis to witness the operation. It is not shown that Dr. Rush, who is a general practitioner, in any way assisted at the operation, or that he even consulted with Dr. Semmes, or that his presence was requested or necessary. His own testimony is that he attended the operation merely as an onlooker, and we do not believe that this item of $100.00 should properly be assessed against defendant.
The statement also includes charges for long distance telephone calls and the travelling expenses incurred by plaintiffs, to which defendant excepts. It is argued that Mrs. Baird could have received adequate and competent treatment from physicians in New Orleans, and that it was not all necessary that she go to Meridian or Memphis. Of course, we would not countenance an injured person burdening a defendant with unnecessary expenses for medical attention received in distant parts when proper medical services could be secured in New Orleans, but under the circumstances of this particular case we cannot say that it was unreasonable or unnecessary for Mrs. Baird to seek treatment in Meridian and Memphis. She had been treated by several New Orleans physicians and obtained no relief, becoming greatly distressed and discouraged because of her lack of progress. Dr. Rush, her life-long friend and family doctor, in whom she had implicit confidence and trust, recommended her to Dr. Semmes. Dr. Anderson, of New Orleans, also recommended Dr. Semmes. *Page 675 
When asked if she acted upon the recommendations, Mrs. Baird testified, "Yes, I had to; there wasn't anything else to do."
Mr. Baird accompanied his wife to Memphis for the operation, and resided in a hotel there during her stay in the hospital. Defendant complains of his expense account. We believe that Mrs. Baird would naturally want her husband to be present with her in Memphis, and it is but natural that Mr. Baird would have a desire to be with her, and we think that the expenses should be allowed, with the exception of a few items. Included in the account are bills for meals, laundry, tips, and telephone calls, which aggregate $33.80, for which we do not believe defendant is liable.
For the above reasons, the judgment appealed from is amended so as to reduce the amount allowed William R. Baird from $3,516.73 to $3,367.93, and as thus amended, and in all other respects, it is affirmed; defendant-appellant to pay all costs.
Amended and affirmed. *Page 729