ANTONIO PORTILLA ET AL., demandantes y recurridos, *v.* CARMEN ANA CARRERAS DE SCHIRA y su esposo PEDRO SCHIRA GILOT, demandados y recurrentes.

*Número:* R-65-146       *Resuelto:* 8 de marzo de 1968

*Rafael Hernández Colón, Ramón A. Gadea Picó, José A. Hernández Colón y Ramón E. Bauzá Higuera,* abogados de los recurrentes; *Carlos J. Irizarry Yunqué,* abogado de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Concluimos que el accidente en este caso causó una fibromiositis en la recurrida María Luisa Martínez de Portilla y en tal virtud debe modificarse la sentencia del tribunal de instancia con el fin de reducir la condena por las lesiones físicas sufridas por ella de $8,000 a $2,000, y los honorarios de abogado a $400. Los fundamentos de este dictámen surgen del análisis de las circunstancias del caso que exponemos a continuación.

### Hechos del Caso

El día 24 de julio de 1962, a las 8:00 P.M., la recurrente Carmen Ana Carreras de Schira, llegó a la Calle Jobos de Ponce conduciendo su automóvil, el cual estacionó en un espacio vacío detrás de un automóvil Volkswagen estacionado allí. Luego de estacionado el vehículo de la recurrente, y al ésta bajarse del mismo notó que una de las ruedas había quedado pillada con el pretil de la acera, por lo que subió al auto otra vez para estacionarlo mejor. Al prender el auto, éste le brincó inesperadamente hacia adelante y chocó con el automóvil Volkswagen (Kharman Ghia) que estaba al frente. Debido al impacto, el Volkswagen se movió a su vez y fue a tropezar con un automóvil Ford que le quedaba delante. Frente a éste había otro vehículo estacionado el cual no fue chocado a su vez por el Ford con motivo del impacto que éste sufrió. En dicho automóvil Ford se encontraba la señora María Luisa Arzola de Portilla con sus hijos menores esperando a su esposo quien visitaba a un familiar en la clínica Dr. Pila. La recurrente se bajó de su automóvil y se ofreció a reparar los daños del vehículo Ford, aceptando así su responsabilidad por dicho accidente. El automóvil fue reparado en el Garage Fao de Ponce a cargo de la Fireman's Fund Insurance Co., compañía aseguradora del automóvil de la recurrente, y fue recogido por la señora de Portilla el

13 de octubre de 1962 por instrucciones de su esposo. En ese día firmó un documento relevando a la compañía ase-guradora y a los aquí recurrentes de toda responsabilidad ulterior con motivo de dicho accidente.

En 4 de enero de 1963, los recurridos radicaron una demanda de daños y perjuicios contra Pedro Schira Gilot, su esposa Carmen Ana Carreras de Schira y Fireman's Fund Insurance Co., alegando, en síntesis, que con motivo del referido accidente, el codemandante Antonio Portilla sufrió daños en su automóvil en la cantidad de $314, $54 de los cuales era por la reparación del vehículo que había sido pagada por la compañía aseguradora; la codemandante María Luisa Arzola sufrió una lesión diagnosticada como "Fibro-myositis paranectebral muscle on the thorac lumbar spine bilateral" y sus daños ascendieron a la suma de $5,000, y el menor Antonio Portilla, Jr. sufrió una cortadura en su rodilla izquierda y sus daños ascendieron a $2,500.

Los demandados contestaron negando los hechos alegados en la demanda. Previo los trámites procesales usuales fue el caso a juicio en 3 de diciembre de 1963.

El día de la vista, el abogado de los recurridos pidió permiso para enmendar la demanda al efecto de alegar que la lesión había sido un disco herniado y reclamar $15,000 por concepto de daños y perjuicios. El abogado de la parte demandada *se allanó* a esa enmienda y el tribunal la permitió.

El tribunal de instancia dictó sentencia en 30 de junio de 1965 declarando con lugar la demanda en cuanto a la causa de acción de la sociedad legal de gananciales constituida por Antonio Portilla y María Luisa Arzola de Portilla y condenó a Pedro Schira Gilot y su esposa Carmen Ana Carreras a indemnizar al matrimonio demandante en la suma de $89 por los daños y pérdida de uso del automóvil y en $8,000 por las lesiones físicas, sufrimientos físicos y angustias mentales de la recurrida y además la suma de

$170 por gastos de tratamiento. Desestimó la demanda en cuanto a la codemandada Fireman's Fund Insurance Company porque "Se le incluyó en el título de la demanda y en la súplica y nada más. La prueba no suplió esta omisión . . . dicha codemandada negó en su contestación todos los hechos de la demanda y teniendo la parte demandada la obligación de probar adecuadamente la responsabilidad de dicha parte, no nos parece que a base de esos indicios se pueda concluir que la parte demandante ha cumplido con esa obligación." También la desestimó en cuanto a la causa de acción del menor Antonio Portilla, Jr. Impuso a la parte demandada el pago de $800 por concepto de honorarios de abogado.

### Apuntamientos

No conforme con la sentencia dictada, la demandada, en apoyo de su recurso, nos apunta que:

1ro. La determinación del tribunal sentenciador en el sentido de que existe una relación de causa y efecto entre el accidente del 24 de julio de 1962 y el alegado padecimiento de la recurrida es claramente errónea porque está francamente contradicha por otras determinaciones de hechos que se hacen en la propia sentencia y por la prueba de la recurrida.

2do. La conclusión a los efectos de que la recurrida, María Luisa Arzola de Portilla, sufrió un disco herniado es crasamente errónea, está palmariamente equivocada, y no representa el balance más racional, jurídico y justiciero de la prueba, imponiendo todas las circunstancias que rodean este caso y que surgen del récord. la única y clara conclusión de que este pequeño accidente se ha utilizado por personas con los medios asequibles, para capitalizar mediante una imaginaria lesión que sólo ha sido diagnosticada a base de alegados dolores que supuestamente siente la recurrida sin que se hayan utilizado ninguno de los métodos positivos que provee la ciencia moderna para entender en estos casos.

3ro. La compensación por las molestias e inconvenientes causados por la supuesta lesión—$8,000—está totalmente fuera de proporción con las mencionadas molestias e inconvenientes.

4to. La imposición de honorarios no se justifica porque no medió temeridad de clase alguna ya que se aceptó la responsabilidad en todo momento y el propio tribunal desestimó dos de las reclamaciones presentadas por los demandantes, a saber: la reclamación contra la Fireman's Fund Insurance Company y la reclamación del menor Antonio Portilla, Jr.

### Discusión de los Referidos Apuntamientos

1.—Consideremos primeramente la controversia sobre si la recurrida sufría o no de un disco herniado. En apoyo de su segundo apuntamiento arguye la recurrente que:

(a) la demanda original se basó en una lesión de fibromiositis no obstante conocer la recurrente el diagnóstico de disco herniado dictaminado varios meses antes. En el momento del juicio la recurrida pidió permiso para enmendar la demanda a fin de reflejar que se trataba de una lesión de disco herniado y para aumentar la reclamación a $15,000. Del récord surge que los recurrentes expresamente se allanaron a esta enmienda.

(b) Los únicos daños sufridos de acuerdo con una nota suscrita por el recurrido Sr. Portilla se refieren a los del vehículo. No se hizo referencia alguna a los que sufriera la recurrida. Esto tiene su explicación en el siguiente testimonio de la recurrente.

"Bueno, yo le dije al Sr. Portilla que me dijera cuáles eran los daños que el Kharman Ghia, con el impacto le había hecho. Le dije: 'hágame una información de su carro . . .'

Yo le dije: 'Señor Portilla, pruebe su carro, que cualquier daño, o cualquier otro detalle, me lo apunta, para yo reportarlo a mi compañía de seguro . . .'

Yo le dije: 'De todas maneras, Ud. me hace el favor me apunta en el papel de su puño y letra *los daños que este accidente le ha causado a su carro*. Me da. su dirección y todos los daños, para yo reportarlo eso a mi compañía.'" (Énfasis suplido.)

(c) El documento relevando a la compañía aseguradora y a los recurrentes de toda responsabilidad por el accidente en cuestión fue firmado por la lesionada más de un mes después de conocer el diagnóstico del Dr. Brinz al efecto de que sufría de un disco herniado por lo que no es posible que fuera a firmar tal documento si en verdad sufrió tal lesión.

De la transcripción surge que cuando la recurrida fue a buscar el automóvil por indicaciones de su marido y firmó el referido relevo, se estaban haciendo reclamaciones extrajudiciales por heridas y daños físicos. Surge, además, que desde el 30 de julio de 1962, seis días después del accidente ya el Lic. Matos se había dirigido a la casa aseguradora sobre estas reclamaciones. Estos hechos, además, fueron estipulados por los abogados de las partes.

Por otro lado, la prueba indica que la recurrida nunca leyó el documento y ella creía que lo que firmaba era "como que estaba recogiendo mi carro", cosa que no es de extrañar. No estamos convencidos de que al firmar dicho relevo la lesionada lo hiciera con pleno conocimiento de lo que estaba firmando.

(d) Que el diagnóstico de disco herniado fue realizado por el Dr. Brinz exclusivamente a base de un examen neurológico; que ésa es la forma más rudimentaria de hacerlo; que la forma más segura de hacerlo es a base de un mielograma; que la recurrida no se ha sometido a ese mielograma y no piensa hacerlo, ni declaró que padeciese de dolores en 1965.

La dificultad con esta contención es que las autoridades

médicas, el perito de la recurrida, Dr. Brinz y el perito del propio recurrente, el Dr. Feliciano, no la sostienen.

El mielograma, según autoridades médicas, está indicado como medida preoperatoria para conocer la localización exacta del disco. *Injuries of the Brain and Spinal Cord*, Samuel Brook (4ta. ed.), 1960, pág. 602.

El Dr. Héctor Feliciano, perito presentado por la recurrente testificó que se hace un mielograma cuando hay sospecha de disco herniado, el paciente no mejora y "uno sospecha que hay que hacer una cirugía . . . . No se opera a menos que tenga un mielograma . . . . Después que yo llegue a la conclusión de que la persona tenga un disco y se considere que se debe operar, se le toma un mielograma . . . ." Preguntado que si tuviera dolor de espalda y sospechase de un disco herniado se haría un mielograma, contestó que "Si me está molestando, lo haría; si no tengo dolor me olvidaría de él."

El Dr. Joseph Brinz, perito de los recurridos, testificó que: "[el mielograma] Es para ayudar a la localización del disco a ver si tiene más de uno herniado . . . [que recomienda un mielograma] porque yo tenía en mente operarla . . . yo le dije que tenía que hacerse un mielograma para cirugía."

Se desprende del testimonio de los peritos que el mielograma no es esencial para un diagnóstico de disco herniado. Así también opinan las autoridades antes citadas. Véase, además, Averbach, Gair, Tuby, *Handling Accident Cases*, Vol. 7 (ed. 1963), pág. 184.

De forma que no incidió el tribunal al concluir que "la negativa de la demandante a hacerse un mielograma tiene importancia desde el punto de vista de la localización exacta del disco herniado, a los fines de una operación."

(e) Sostiene la recurrente que le extrañó que la recurrida no declarara en el 1965 que los dolores que padecía

en el 1963 subsistían. De la transcripción de evidencia no surge que se le haya hecho esa pregunta. No vemos cómo se puede sorprender la recurrente de que para esa fecha la recurrida no sentía dolores, pues no se le preguntó.

(f) Arguyen los recurrentes que la lesionada se ha negado a operarse del disco herniado hasta el presente. Ella lo explicó diciendo que sentía miedo de operarse. Debido a ese temor vino a San Juan para verificar con el Dr. Longo el diagnóstico del Dr. Brinz. Eso es comprensible si se toma en consideración que, según el Dr. Brinz, aun teniendo éxito dicha operación "la espalda no va a quedar tan fuerte como antes. Queda cierta limitación. No pueden hacer ejercicios violentos ni levantar objetos pesados."

(g) Las radiografías que se tomaron a la lesionada para diagnosticar su lesión fueron negativas. De acuerdo con las autoridades médicas las lesiones del disco herniado no se reflejan en las placas radiológicas. Averbach, Gair, Tuby, *Injuries of the Brain and Spinal Cord*, supra, pág. 625; Rene Coillet, *Low Back Pain Syndrome*, págs. 212–213; *Baird* v. *Employee's Liability Assur. Corp.*, 38 So.2d 669, 673 (La. 1949).

(h) Que el diagnóstico del Dr. Brinz está basado en información errónea suministrada por la recurrida.

Esta cuestión la discutiremos bajo el apartado 2, más adelante.

(i) Que la hospitalización de enero de 1963 fue debida a un envenenamiento con *trilafón* y el Dr. Brinz sólo atendió el caso en consulta.

Según el testimonio del Dr. Brinz el caso fue atendido tanto por el Dr. Fernández Durán como por él. El Dr. Fernández Durán atendió el envenenamiento y el Dr. Brinz fue llamado para el dolor de espalda. Del récord médico introducido en evidencia surge que ésa fue la realidad y no fue rebatida por la recurrente.

(j) Que a la recurrida nunca se le administró tratamiento a base de tracción ni se le recomendó el uso de corsé ortopédico.

Surge de la prueba que la representación legal de los recurrentes le hizo al Dr. Brinz la siguiente pregunta general: "¿Usted le hace alguna recomendación?" Y contestó: "Se le puede hacer una recomendación específica; Primero, que ponga una madera debajo del mattress y que no haga ejercicio voluntaria; se le pone el medicamento, relajantes musculares, calor a la espalda y se le recomienda que no use tacos altos."

Sin embargo, no insistió en el contrainterrogatorio sino que lo llevó a otra cuestión. Si no le hizo la pregunta sobre tratamiento de tracción y corsé ortopédico no puede saber si se le suministró ese tipo de tratamiento.

2.—Consideremos ahora el primer apuntamiento.

■ La prueba pericial con respecto a la naturaleza de la lesión ocasionada a la recurrida por el accidente en cuestión es conflictiva. Esto ocurre con frecuencia en este tipo de casos. El tribunal de instancia le dio crédito al testimonio del neurólogo Dr. Brinz al efecto de que la referida lesión consistió de un disco herniado. Estamos en las mismas condiciones que dicho tribunal en cuanto a la apreciación de prueba pericial. *Ortiz Rodríguez* v. *A.F.F.*, 94 D.P.R. 546 (1967).

■ Antes de analizar tal prueba es necesario dejar sentado que los recurridos llevaban el peso de establecer mediante una preponderancia de prueba, la naturaleza de la lesión que padecía la recurrida y la relación causal existente entre dicha lesión y el accidente causado por la negligencia de la recurrente. *Burgos Quiñones* v. *Autoridad Fuentes Fluviales*, 90 D.P.R. 613 (1964); *Moore* v. *Glasgow*, 366 S.W.2d 475, 483 (Mo. 1963); *Burke* v. *Commercial Standard Ins. Co.*, 38 So.2d 644, 646 (CA 2d La. 1949).

Veamos la prueba en cuestión. Los doctores Rafael Acosta Olmedo y Héctor Feliciano coincidieron en que la lesión en cuestión fue una fibromiositis. Testificó el Dr. Feliciano que examinó a la recurrida en 22 de septiembre de 1963 y que:

"De acuerdo con el historial la paciente de treinta y tres años había estado envuelta en un accidente en julio 24 de 1962, en el cual estaba ella, había el carro donde estaba parqueado . . . .

Inmeditamente después del accidente ella no tuvo lesiones, síntomas, pero unos días después desarrolló un dolor en la espalda en la región lumbar que irradiaba por la parte trasera inferior y se le cayó más hacia el lado izquierdo. Entonces visitó en julio 27 de 1962 un médico en Fort Allen que diagnosticó una 'fibromiositis.' Entonces le tomaron placas de la región lumbar y según me informaron eran negativas. El dolor no era constante, variaba en intensidad desde muy poco hasta severo. Se aliviaba con relajantes musculares.

Entonces siguió teniendo episodios de dolor desde el accidente que pueden durar varios días. Entonces fue hospitalizada en agosto del 1962 por el doctor Brinz porque tenía dolor y fue vista también por el doctor Longo.

.   .   .   .   .   .   .   .   .

. . . le sugirieron también una operación para un disco herniado, que le sugirieron un examen de mielografía que ella no se iba a dejar hacer. Palabras de ella 'ad verbatum'. Entonces después de eso el tratamiento me dijo que había sido puesta en una cama ortopédica . . . . En el examen físico 33 años, bien desarrollada, de tipo esténico, o sea, alta, desarrollada, alta, delgada, de extremidades largas; presión ciento diez sobre setenta, pulso 88, respiración 18. El examen oftalológico es negativo. Las pupilas reaccionan normalmente a la luz y a la acomodación; pecho y corazón negativos. En la espalda no hay espasmos ni limitaciones de movimiento. El examen neurológico revela un 'team' de lasegue negativo; los reflejos paternales están normales; no hay reflejos patológicos, incluyendo dolciflexión normal de los dedos de los pies. Mi impresión después de considerado el historial y el examen físico es que la paciente sufrió una contusión a la espalda debido a un 'jarring motion'. Es un golpe cuando hay un automóvil estacionado que le dan y se menea de un lado hacia otro la persona, como cuando hay un 'whiplash'. Entonces mi im-

presión es que hubo eso y le causó un fibromiositis traumático en la región lumbar."

Interrogado sobre si la caída en un baño unos meses antes, los movimientos que tiene que realizar como madre de unos niños luego de estar con ese golpe, podía dar lugar a una lesión en un disco, contestó que:

"Yo creo que sí. Específicamente también hay otro factor que no hemos mencionado hasta ahora que es que toda persona empieza a degenerar de la columna vertebral y de los discos desde los veinte años en adelante. Ella tiene treinta y tres. Y si es esa clase de 'body building', la degeneración va progresando más. Entonces el factor de postura de la persona, de usar taco alto, del diario vivir, todo eso podría ocasionar un disco en la persona."

Explicó la fibromiositis así:

"una 'fibromiositis' toracolumbar se refiere a una inflamación no específica; al decir no específica quiero decir que no se debe a bacterias o también a un agente conocido sino una inflamación no conocida de músculo y tendones de la región toracolumbar. En estas inflamaciones ocurre microscópicamente hinchazón en el músculo y en el tendón e invasión por glóbulos rojos y blancos del músculo y el tendón y hay dolor, inflamación local. A veces cambia de temperatura, se pone más caliente el área y es una inflamación 'self limited' limitada de unos días o quizás unas dos semanas. Las causas más comunes de esto son trauma y enfermedades emocionales."

Añadió que el movimiento a que estuvo expuesta la recurrida le pudo producir un *whiplash injury* (lesión de latigazo) en la espina cervical, o sea, entre las vértebras uno y siete pero en este caso no se produjo. En contrainterrogatorio confirmó su diagnóstico de fibromiositis traumática lo que ocasiona una incapacidad de tres semanas con dolor; que "esos dolores que sigue sintiendo [la recurrida] no están relacionados con el accidente." Manifestó estar seguro de ello y de que cuando la examinó no tenía ningún disco herniado. Añadió que "Hay un sinnúmero de individuos que se quejan de dolor

de espalda y este dolor le viene a resolver un conflicto emocional, especialmente si hay envuelta una 'litigation'."

Por el contrario, el neurólogo, Dr. Joseph Brinz testificó que le hizo un examen neurológico a la recurrida en agosto de 1962; que "La señora venía con la queja de dolor de espalda intermitente que se radiaba a la extremidad inferior izquierda . . . . Bueno, *la historia que hacía* era que había estado en un accidente automovilístico. El carro de ella fue golpeado; entonces se fue hacia delante *y comenzó a tener dolor de espalda en ese accidente y de ahí en adelante el dolor se le fue agravando.*" (Énfasis suplido.) "En resumen que la señora tiene un disco lumbar herniado del lado izquierdo haciendo presión a las raíces del lado izquierdo." Preguntado en qué basó ese diagnóstico, dijo:

"Varios hallazgos; primero, que el reflejo aquileo del lado izquierdo está disminuido.

.    .    .    .    .    .    .    .

Intensidad menor que el lado derecho; una impresión de obtener un movimiento desde el pie en la audición al golpear el reflejo aquileo.

.    .    .    .    .    .    .    .

Ella tiene una hipolgesia, que siente menos en el delmatomo L-5, S-1, 2 y 3. El delmatomo son las diferentes áreas de la pierna representadas por diferentes nervios sensoriales. Es decir, la raíz L-5, uno quiere decir anatómicamente que da sangre a la parte lateral de la pierna y entonces S-1, a los dedos 1, 2, 3, y a veces 4, la parte del pie y el muslo. Aquí, es ésta la parte posterior del muslo.

Lic. Irizarry:

¿La hipolgesia es que siente menos?

Sí, señor.

¿Sería como un adormecimiento en esa parte?

Sí, señor.

¿En su lado derecho siente bien?

Sí, señor.

¿Y en el lado izquierdo siente menos?
Sí, señor.

.     .     .     .     .     .     .     .

Un signo de estiramiento que al uno levantar la pierna el dolor se produce en la espalda, en el muslo y en la pierna. Eso es importante. Cuando una persona da un signo falso está tratando de decir que tiene dolor de consideración en la espalda. Como no sabe el mecanismo completo."

Se le interrogó si veía relación entre el disco herniado y el accidente que sufrió la recurrida en julio de 1962. Contestó que: "Bueno, lo que se acepta en el disco herniado es que la mayoría de los discos herniados se deben a un trauma o a múltiples traumas"; que en efecto "veía" relación de causa y efecto entre el disco herniado en este caso y el referido accidente. Se le hizo la siguiente pregunta: En el caso de esta señora, asumiendo que ella siente un golpe y que entonces de momento se siente ese movimiento violento que la hace irse de cabeza en el asiento del frente donde está, ¿puede eso producir esa lesión a su vértebra lumbar? Su contestación fue: "Sí, seguro que sí." Negó que el disco herniado se debiese a un proceso degenerativo.

El testimonio del Dr. Brinz, a nuestro juicio, quedó debilitado y menos creíble por el conjunto de otros elementos de prueba que pasamos a relacionar.

(a) La lesionada testificó que en febrero o en marzo de 1962 resbaló y se cayó sentada en el baño; no fue una caída fuerte; sintió dolores en la espalda después con motivo de lo cual fue a ver al Dr. Acosta. Le dijeron que no tenía nada. Sobre este particular fue contrainterrogado el Dr. Brinz así:

"LIC. HERNÁNDEZ:
¿Si yo le informo a usted que la señora María Luisa Arzola sufrió una caída en el baño de su casa en febrero de 1962 donde cayó sentada y le produjo un dolor que la llevó a visitar un médico y que le permaneció por varios días, podría decirme si usted encontraría alguna relación entre ese trauma y los que-

haceres y los traumas normales que sufriera el disco de ella con sus quehaceres incidentales de su vida y la condición que se le presenta ahora?

TESTIGO:

Yo no capté bien la pregunta.

¿Que si el trauma sufrido en febrero de 1962 acumulado a los demás traumas que sucesivamente tiene que sufrir porque son los normales de su vida de esposa, etcétera, todo eso en conjunto le haya podido producir este disco herniado?

Yo puedo decir que ese golpe en la espalda no le hace bien a nadie.

LIC. HERNÁNDEZ:

Cayó sentada.

Un golpe en la espalda no le hace bien a nadie y es posible que ese sea un factor contribuyente. No lo puedo decir afirmativamente ni negar categóricamente.

¿Podría darnos su impresión de la forma en que ocurrió este accidente? En otras palabras, ¿la impresión en que usted basó la opinión que le dio al compañero que el trauma recibido era quizás suficiente para producirle este tipo de disco herniado?

¿De lo que me dijo?

De lo que usted entiende.

Yo entiendo que estaba en la Calle Jobos en un carro que estaba estacionado. Esta señora estaba con unos nenes y al recibir un impacto por detrás esta señora se fue hacia delante y al irse hacia delante fue violentamente; ella no perdió el conocimiento y sintió entonces dolor en la región lumbar.

LIC. HERNÁNDEZ:

¿Inmediatamente?

Inmediatamente.

¿Le dijo que había sido un golpe violento?

TESTIGO:

Bueno, no le pregunté si había sido un golpe extraordinariamente violento, pero sí violento.

LIC. HERNÁNDEZ:

¿Le dio la impresión que había sido un automóvil que se encontraba estacionado y que lo habían tratado de poner en movimiento y le dio a un carro que quedaba detrás de ella y que a su

vez el carro le dio al de ella, o le dio la impresión que estaba estacionado y venía un carro caminando y le dio?

No le puedo decir porque no le pregunté eso. Todo lo que sé es que el carro de ella estaba estacionado y la golpearon por detrás. No sé la información de si venía otro carro caminando o no. Eso no lo sé.

LIC. HERNÁNDEZ:

¿Entonces le dijo que al irse para el frente en qué forma se fue para el frente?

Se fue hacia delante. Parece que quedó sentada y se dobló así.

¿Y ahí fue donde sintió el golpe?

Sí, señor."

(b) Nótese que al Dr. Brinz se le informó que la lesionada sintió dolor en la espalda inmediatamente después del accidente cuando ella testificó que esos dolores comenzaron un par de horas después.

(c) Como al Dr. Brinz no se le explicó cómo ocurrió el accidente en todos sus detalles estuvo justificado en basar su dictamen en que el vehículo de la lesionada fue chocado con violencia cuando aparentemente no fue así ya que la reparación de los daños al mismo sólo costó $54, y el carro aparentemente fue sacudido pero no se movió mucho pues no alcanzó al vehículo que le quedaba delante; el golpe que sufrió tiene que haber sido considerablemente menor que el que recibió el Volkswagen con motivo de lo cual éste fue movido hacia delante hasta chocar con el Ford de la lesionada.

(d) No obstante lo ocurrido y la dolencia de que se queja, la recurrida ha continuado trabajando como secretaria en una empresa comercial. Admitió que bailaba aunque no mucho.

■ Concluimos de lo expuesto que la preponderancia de la prueba no estableció que la recurrida padeciese de un disco herniado y que hubiese una relación causal entre dicha lesión y el accidente en este caso. El diagnóstico de fibro-

miositis, según lo explicó y justificó el Dr. Feliciano, nos parece el más razonable y creíble a la luz de la naturaleza y extensión del accidente.

3.—En vista de lo expuesto concluimos que la cuantía justa y razonable que debe concederse por los sufrimientos morales de la recurrente resultantes de la referida lesión ocasionados por el accidente es la suma de $2,000.

4.—La imposición de honorarios de abogado debe reducirse a la suma de $400.

*La sentencia del Tribunal Superior, Sala de Ponce, debe modificarse en los referidos extremos y así modificada se confirmará.*