73 So.2d 23 (1954)
McNULTY
v.
TOYE BROS. YELLOW CAB CO.
No. 20214.
Court of Appeal of Louisiana, Orleans.
June 7, 1954.
*24 Fishman, Reuter, Rosenson & D'Aquin, New Orleans, for plaintiff and appellant-appellee.
Deutsch, Kerrigan & Stiles, and Breard Snellings, New Orleans, for Toye Bros. Yellow Cab Co., defendant and appellant-appellee.
Henry M. Elkins, Jr., Gordon Boswell, and Stanley E. Loeb, New Orleans, for Henry M. Kratzberg, defendant and appellee.
Before McBRIDE, J., and NABORS and MARKS, JJ. ad hoc.
McBRIDE, Judge.
Plaintiff claims of defendants, in solido, the sum of $160,038.93, in damages, for personal injuries, attendant expenses, and loss of income, alleged to have been sustained by her on the clear and dry day of August 2, 1950, at about 4 o'clock in the afternoon, as a result of the Yellow cab in which she was a passenger running into the automobile ahead. Toye Bros. Yellow Cab Company, owner of the cab, and Henry M. Kratzberg, who operated the other automobile, are impleaded as defendants, it being alleged that the operators of both the vehicles were guilty of concurrent negligence.
Plaintiff recovered judgment below for $25,425.16 against the cab company; the suit against the other defendant was dismissed. Plaintiff and the Yellow Cab Company have appealed. Plaintiff has answered the appeal of the cab company praying for an increase in the amount of the judgment against said appellant.
The facts surrounding the accident may be thus stated: Four automobiles were proceeding in an uptown direction on St. Charles Avenue in the lane adjacent to the neutral ground and all were traveling from *25 20 to 25 miles per hour; the first car in the lane was a Nash, the second a United cab, the third was Kratzberg's Plymouth, and then followed the Yellow cab, in which plaintiff was riding as a passenger. The United cab followed the Nash at a short distance, Kratzberg's car followed the United cab by about 8 feet, and the Yellow cab was from 30 to 40 feet behind Kratzberg. The four automobiles had traveled in about the same positions for several blocks; Nobles, who operated the cab, stated he had followed Kratzberg from Jackson Avenue or for some nine blocks before the accident occurred. He admits he was in a hurry, "making time" as he put it; he stated that he desired to pass Kratzberg's car and had sounded his horn several times signaling such intention. Traffic was heavy at the time; besides the line of four cars, other automobiles were in the traffic lane to the right and an uptown-bound streetcar was moving on the neutral ground to the left just about abreast the Kratzberg automobile. Both Nobles and Kratzberg well knew the above-mentioned traffic situation; Kratzberg was cognizant that the Yellow cab followed him at but a short distance, and he also knew that because of the streetcar, an automobile above intending to make a left turn would have to halt to await the passage of the streetcar. The accident happened at a point near Seventh Street when the Nash, the first car in line, negotiated a left turn into said street, causing the United cab to come to a sudden stop and forcing Kratzberg to bring his car to an abrupt stop, the result being that the Yellow cab ran into the rear of the Kratzberg car striking it a light blow.
Nobles is charged with several specific acts of negligence which need not be recounted here, as counsel for the cab company with admirable frankness concede that Nobles was guilty of negligence and that it is liable to plaintiff for whatever amount she may recover. But, the Yellow Cab Company, as well as the plaintiff, contends that Kratzberg was guilty of joint and concurrent negligence and is solidarily liable for plaintiff's damages.
The charge against Kratzberg is that he negligently brought his car to a sudden and unsignaled stop, it being contended that this action on his part contributed to the accident. The record reflects that Kratzberg gave no hand signal of his intention to bring his car to a stop, but it also appears that his vehicle is equipped with an automatic stop-light signal located on the rear of the vehicle, and this automatic signal was in perfect working order at the time in question. It is argued by both appellants that the provisions of the local traffic ordinance require that a hand signal be given by a motorist when intending to bring his vehicle to a stop. It is also pointed up in appellants' arguments that whereas Kratzberg knew all along that his automobile was being closely followed by the Yellow cab, and that because of the traffic conditions he also knew he might at any time be called upon to execute a sudden stop, he should have been mindful of the fact that a sudden stop on his part without signal was likely to bring disaster to the vehicles following his car.
Article VI, § 1, of Ordinance 13,702, C.C.S., City of New Orleans, insofar as is pertinent here, provides that in stopping a visible signal shall always be given to vehicles in the rear by the motorist intending to stop by means of a mechanical or electrical traffic signal approved by the Commissioner of Public Safety, or by means of a manual signal, in which case the operator of the vehicle shall extend his left arm downward.
Even if it can be said that Kratzberg was technically guilty of a violation of the said provisions of the ordinance, we cannot understand how the failure to give the signal contemplated by the ordinance amounted to a proximate cause of the accident or had the remotest causal connection with the injuries Mrs. Bowen sustained. It has been repeated over and over by courts of this State that the violation of an ordinance plays no part in the final analysis of a tort action, unless there is a causal connection between its violation and the resulting accident. See Vernaci v. Columbia Cas. Co., La.App., 71 So. *26 2d 417; Mellow Joy Coffee Co. v. Continental Cas. Co., La.App., 63 So.2d 888; Todd v. New Amsterdam Cas. Co., La. App., 52 So.2d 880; Kemp v. Donnes, La. App., 32 So.2d 383; Williams v. Pelican Creamery, Inc., La.App., 30 So.2d 574.
The four vehicles, as has been said, had been traveling along under congested conditions, and it is certain that Kratzberg was vigilant and alert because, as shown by the evidence, he managed to stop his car when the necessity for doing so arose, although he followed the United cab by a scant 8 feet. There is some contention made that the Kratzberg car struck the United cab, but we do not believe that this is true; Kratzberg testified otherwise. At the time Nobles, in his cab, was from 30 to 40 feet from the rear of the Kratzberg car "making time"; that he was bent upon getting ahead of Kratzberg is attested to by his persistent efforts in that direction. When asked if he could have brought his cab to a safe stop had Kratzberg given the hand signal, Nobles' reply was: "I sure could." Yet he admits that the speed at which his car was being driven a distance of from 50 to 60 feet would have been necessary to make a normal stop "without throwing the passenger off the seat."
Nobles denies seeing the automatic signal light on the Kratzberg car flash when Kratzberg was in the process of stopping. There is no showing that Kratzberg's stoplight signal had ever received the approval of the Commissioner of Public Safety, but the fact that such a signal light was given indicates most strongly that Nobles was inattentive and was not looking ahead to see what was there to be seen and what should have been expected under the traffic conditions prevailing on the journey up St. Charles Avenue.
We agree with appellants' counsel that Kratzberg fully knew that the Yellow cab was but a short distance to the rear of his Plymouth, and that he also fully knew that at any time he might be required to abruptly stop in the line, but we do not agree that the duty rested upon him to drive far enough behind the United cab so as to be able to give the manual signal required by the ordinance to the vehicles following him. We do not think the provisions of the ordinance in respect to the signal were ever intended to apply in such a situation as existed and confronted Kratzberg at the time of the accident. It is to be seen that the ordinance provides that the motorist intending to stop should give the prescribed signal at least 50 feet before slowing up to stop, and if appellants' arguments are to prevail, then it would mean that Kratzberg should have remained 50 feet or more behind the United cab, which would be, to say the least, inconsistent with what is naturally expected in heavy traffic movements on a prominent boulevard in a city as large as New Orleans. Counsel for the Yellow Cab Company have cited us to several cases, namely, Finance Security Co. v. Thurman, La. App., 9 So.2d 846; Dunaway v. Cade, La. App., 39 So.2d 148; and Silverstein v. Board of Commissioners of Port of New Orleans, 8 La.App. 304; in each of which it was held that the motorist who had failed to give a stopping signal was guilty of negligence. Our reading of the cases discloses that in none were the traffic and other conditions anywise similar to those found in the instant case. Then, too, none of the cited cases can possibly have application for the simple reason that if Kratzberg were required to give a signal such as appellants say he should have given, the signal would have been ineffectual and the accident could not have been averted in view of Nobles' admission that the distance at which he trailed Kratzberg's automobile provided insufficient stopping space.
Courts have come to the realization that traffic conditions of today being what they are, a person operating an automotive vehicle in a line of traffic must be at all times vigilant and alert and must keep a sharp lookout for sudden maneuvers by vehicles ahead and appraise carefully the existing conditions. In Gandy v. Arrant, La.App., 50 So.2d 676, 678, the Court of Appeal for the Second Circuit was confronted with a factual situation closely *27 resembling that presented by the instant case. Therein it was said:
"A prudent person, traveling the highway, who becomes one link in a line of vehicles, must necessarily be on the alert, observing the car ahead and the general traffic situation in front. In the case before us, had defendant Arrant been alert and observant of traffic conditions ahead, he could and would have observed the stopping of the Livingstone truck, which was larger than the following Chevrolet and Nash passenger vehicles. Evidently the Chevrolet driver immediately behind the truck was alert as this vehicle came to a timely stop. Likewise the plaintiff's Nash, the third car in line, was brought to a stop without crashing into the vehicle ahead. Had defendant Arrant been keeping a proper lookout ahead, he likely would have noted the existence of the bridge, the presence of the truck approaching from the opposite direction, and surely would have noted the stopping of the beverage truck and the successive stops of the Chevrolet and Nash automobiles, and would have had sufficient time to have brought his own vehicle to a stop before crashing into the rear of plaintiff's car. Arrant's failure to successfully stop his car indicates that he was guilty of one or more of the acts of negligence charged in plaintiffs' petition. * * *"
Section 963, of Vol. 2, p. 185, Blashfield's Cyclopedia of Automobile Law and Practice, Perm.Ed., recites in part:
"* * * The conditions of traffic or otherwise may be such that a failure to signal will not constitute negligence; * * *."
The rule is also stated in 60 C.J.S., Motor Vehicles, § 301, p. 711, as follows:
"* * * Whether the failure of the driver to give a signal on stopping constitutes negligence must be determined from the particular situation then existing, and the failure to signal may be excused by traffic conditions * * *."
The Court of Appeal for the First Circuit, in Hebert v. Keller, 17 So.2d 746, 747, had this to say:
"* * * the condition of traffic and the circumstances under which young Hebert was required to stop or slow down did not require him to give a hand signal; that the mechanical stop light signal on the rear of the car was all that could be reasonably required of him under the circumstances where it was necessary for him to make an emergency stop not caused by his own acts. In our opinion, the proximate cause of the accident was the negligence of the defendant in running into the Hebert car * * *."
We perceive no negligence on Kratzberg's part. Our conclusion is that under the conditions under which both Nobles and Kratzberg operated their respective vehicles, the sole and only proximate cause of the accident was the action of Nobles in driving his cab at a distance behind Kratzberg's car within which he well knew he could not stop if it became necessary for him to do so. Nobles was fully cognizant of the relatively slow-moving traffic ahead of his cab and also of the automobiles to the right and the streetcar to the left on the neutral ground, and had he taken the situation into consideration and been mindful of the welfare of his passenger, this present lawsuit would never have occurred.
Mrs. Bowen at the time of the accident was 46 years old. She stated that she was thrown forward from the rear seat of the taxicab in a sliding fashion, her head striking the meter box situated behind the driver's seat. She came to rest in a kneeling position on the floor of the cab. Our study of the evidence inclines us to the belief that Mrs. Bowen was thrown from the seat because of the abruptness with which the cab was brought to a stop and not from the impact between the two vehicles. The impact was slight, the only *28 casualty to Kratzberg's car being a cracked glass on a rear light.
Plaintiff was within a short time conveyed to the Baptist Hospital in another Yellow cab, whereupon her regular family physician, Dr. J. Arthur White, a general practitioner, was summoned. Dr. White found that Mrs. Bowen had sustained contusions about her body and extremities and was mentally confused and talked incoherently. The doctor particularly mentioned bruises around the right eye, on the right forearm, and both legs. Mrs. Bowen suffered pains in the back and neck. After treating her, and she failing to respond in the manner Dr. White expected, he immediately called in Dr. James LeNoir, an orthopedic surgeon, for a consultation which was had the next day, August 3, 1950. It might be well to mention that this was the only time Dr. LeNoir saw Mrs. Bowen after the accident. He advised a spinal survey and a neurosurgical consultation, and on the following day Dr. John A. Colclough was called in. Dr. White continued to treat Mrs. Bowen for the superficial injuries, and on September 30, 1950, Dr. Colclough by surgical procedure corrected a fifth lumbar herniation. In January of 1951 it was found that Mrs. Bowen was suffering with an abscess and from osteomyelitis of the bone of the sacrum and the fourth and fifth lumbar vertebrae, the abscess and the other condition having developed from the operation Dr. Colclough had previously performed. In September of 1951 Mrs. Bowen was fitted with a steel corset and brace which she still wore on the day of the trial below, October 28, 1952.
The injuries sustained by Mrs. Bowen on August 2, 1950, were of a severe nature; she suffered excruciating pains for nearly two years, was bedridden for some fourteen months, several of which were spent in traction, a painful and most uncomfortable medical procedure. She was in and out of hospitals, the Baptist and the Foundation, about five or six times, our calculations showing that her hospitalization covered a total period of about seventy-seven days. In June 1951 she reached a state of despondency such as to cause her to attempt to take her life by ingesting an overdose of sleeping pills. At the trial some of the medical experts stated that it would require two years for a complete recovery, provided, however, that Mrs. Bowen continued to improve at the same rate as in the past.
Counsel for the Yellow Cab Company, in resisting the quantum of damages claimed, argue that the herniated disc, the most serious of the injuries, was not sustained by plaintiff as a result of the accident in the taxicab on August 2, 1950. They produced two medical experts whose testimony is relied upon as the basis of the contention, namely Drs. Lyon K. Loomis and Howard Karr. Each of these physicians saw plaintiff but once and then more than two years after the accident, their examinations having been made at the behest of counsel for the cab company. The gist of the testimony of these two physicians is that they could not believe that the disc condition resulted from the cab accident because symptoms of pain in the lower back did not manifest themselves immediately, or as Dr. Loomis stated "within just a day or so."
It is true that Dr. Colclough did not diagnose the condition until September 23, 1950, more than two months after the accident, notwithstanding that X-rays were taken and a myelogram made. The X-rays and the myelogram were negative, but little consideration should be given to this as both procedures in many cases prove to be inconclusive.
We are convinced that the herniated disc resulted from the accident; Mrs. Bowen experienced pains in the back from the accident. Dr. White testified that she complained of pains in the neck and back throughout the period of his treatments between August 2 and September 3, 1950. She had never complained to Dr. White of back injuries before, although he had been her physician for several years. Dr. LeNoir, who examined Mrs. Bowen the one time on August 3, 1950, for the injuries sustained in the cab, had also *29 previously treated Mrs. Bowen. It seems Dr. LeNoir had treated her some months before for accidental injuries and as late as July 17 and 24, 1950, a few days before the accident in the taxicab, had examined her for injuries to her hand. Mrs. Bowen made no complaints to Dr. LeNoir on July 17 and 24 about trouble with her back. Dr. LeNoir stated that when he examined her in Baptist Hospital on August 3, 1950, she had cervical or neck muscle spasm and tenderness over the lateral aspect of the neck, both on the right and left of the center. When asked:
"Could this pain that Mrs. Bowen complained to you about in the shoulders and neck been due to a disc herniation at the fifth lumbar disc?
He answered:
"It could. However, at the time I saw her and on the occasion I examined her, I felt because of the complaints, the subjective aspect of the thing, that a neurosurgical consultation was in order, to rule out or evaluate any nerve or spinal cord injury or brain injury. I did not feel that there was enough evidence, objective evidence, to account for the complaints elicited."
Dr. Colclough in speaking of his findings on August 28, 1950, said this:
"* * * There was point tenderness over the fifth and sixth cervical interspaces, with causation of pain by pressure at these points. The pain thus produced extended into both shoulders, and on the right side into the deltoid muscle region, that is, the upper right arm."
Dr. Colclough also stated that when he first saw the plaintiff on August 4, 1950,
"* * * she had paresthesia and hyperesthesia of all the digits of the right hand, moderate stiffness of her neck, generalized tenderness over the entire spine, especially the sacral and coccygeal regions."
On direct examination Dr. Colclough was asked this question:
"Doctor, knowing that Mrs. Bowen was involved in an automobile accident August 2, 1950, would you say her trouble with this herniated disc was caused by this accident?"
He replied:
"In the light of what has been proven medically, I would have to say yes."
He further testified thusly:
"Now, what effect would it have in your answer if I told you that Mrs. Bowen had had no trouble with her back from the year 1946 up to August 2, 1950, the date of this accident? A. I would have to say that it bore a direct causal relationship.
"Q. When you say that it bore a direct causal relationship, do you mean that the accident bore a causal relationship to the herniated disc? A. Yes, sir."
Appellants seek solace in Dr. Colclough's testimony to the effect that a disc herniation might be caused by bending over and tying his shoe or getting out of bed quickly in the morning and even from brushing the teeth in the morning. Those may all be possible causes, but we, like the trial judge, believe that the medical testimony preponderates in favor of plaintiff's contentions. It must be borne in mind that Dr. Colclough was the attending physician and as such was in the superior position to testify as to the symptoms and nature and duration of plaintiff's complaints. Drs. LeNoir, Loomis, and Karr each saw the plaintiff but once and then for the purpose of examination. Courts are inclined to accord more weight to the testimony of the attending physician than that given by other experts who merely examined the patient. See Vienne v. Chalona, La.App., 28 So.2d 154; Trascher v. Eagle Indemnity Co. of New York, La.App., 48 So.2d 695; Washington v. T. Smith & Son, La.App., 68 So.2d 337.
*30 The judgment awards Mrs. Bowen the sum of $25,425.16, itemized as follows:

"For personal injuries, pain
 and suffering $18,000.00
Future pain and suffering 2,500.00
Medical expenses and fees,
 as per stipulation (identified
 as "Expenses-1") 4,240.16
Loss of Income 385.00
Expert Fees to doctors:
 Dr. James L. LeNoir 100.00
 Dr. John A. Colclough 100.00
 Dr. Thomas L.
 Duncan 100.00
 ______
 300.00"

Plaintiff, in answer to the cab company's appeal, alleges that the award in inadequate and prays for an increase thereof to $44,925.16. On the other hand, counsel for the cab company say that the award is excessive and should be substantially reduced. They criticize only the allowances for personal injury, pain and suffering, and for future pain and suffering. The other items are not challenged.
As has been said in so many cases in this State, there is no rule or standard for assessing damages for personal injuries, and the assessment of such damages is reposed in the sound discretion of the court, each case to stand on its own facts and circumstances. However, it has also been said that there should be a uniformity in such awards if possible. In Baird v. Employers' Liability Assur. Corp., Ltd., La.App., 38 So.2d 669, decided in 1949, we had occasion to allow damages to a plaintiff who had sustained a herniated intervertebral disc which was corrected by surgery, and the plaintiff, like Mrs. Bowen, experienced much pain and had residual injuries and underwent prolonged medical treatments and procedures, being placed at times in traction. The award was $12,000. However, the instant case differs from the Baird case in this respect: Mrs. Bowen sustained injuries in addition to the herniated disc and also suffered from the ensuing osteomyelitis and the abscess. We believe that the judgment appealed from is excessive to the extent of $3,000, and that it should be accordingly reduced.
For the foregoing reasons, the judgment appealed from is amended so as to decrease the amount thereof to $22,425.16, and as thus amended and in all other respects it is affirmed. Plaintiff is to pay the costs of this appeal.
Amended and affirmed.