McBRIDE, Judge.
By this suit the plaintiff seeks to recover a large amount for personal injuries, loss of wages, medical expenses, etc., sustained by reason of an accident between his automobile and a truck jointly owned by Louisiana Pine Products, Inc., and Home Charcoal Company and driven by their employee. The suit is directed against the owners of the truck, its driver, and the liability insurer thereof.
Following a trial by jury, plaintiff recovered judgment for $19,000 against defendants in solido, Hartford Accident and Indemnity Company being cast for $5000 (the limit of its policy liability). All defendants have appealed. Defendants admit negligence on the part of the truck driver and the issues presented by the appeal are (1) whether the case should be remanded for another jury trial, and, alternatively, (2) whether the amount of damages allowed by the jury is excessive.
The offending truck was stopped on South Claiborne Avenue, its driver intending to make a left turn into Earhart Boulevard. Being apprehensive of the truck’s *408 protrusion into the intersection the driver backed it several feet to eliminate the protrusion. In the backing maneuver, the rear of the truck struck the front of a 1955 sedan automobile owned and operated by plaintiff, which had come to a stop a few feet immediately to the rear of the truck.
The initial issue presented is appellants’ prayer for a remand of the case for another trial based on the contention that their interests were prejudiced at the jury trial. At the conclusion of the protracted trial below, counsel for the respective parties made their arguments to the jury. Plaintiff’s counsel opened, defendants’ attorneys responded and then plaintiff’s attorney closed the arguments. It is said that in counsel’s closing argument he, for the first time, endeavored to measure in monetary figures the extent of plaintiff’s damages. Thereupon, defendants’ counsel objected to the introduction of new issues in rebuttal argument and requested leave of court to reply by surrebuttal. Plaintiff’s counsel objected to the request and withheld consent and the court denied the request made on behalf of the defendants. It is contended for appellants that as they were denied their right to argue quantum to the jury, after plaintiff’s counsel had irregularly done so, they were deprived of due process of law with the result their cause was irreparably prejudiced. In support of their argument that the rebuttal was improper, appellants point to Rule 14 of the .Civil District Court for the Parish of Orleans which, in Section 1, states that the judge shall fix the time to be allowed for oral argument and shall designate the sequence thereof, and, to Section 2 of the rule that provides that counsel opening the argument shall present his whole case as he relies on it and shall be heard in the concluding argument only in reply to the argument of counsel on the other side.
The action of the trial judge in refusing to allow defendants’ counsel to further argue their case did not amount to reversible error in spite of Rule 14. There is a dispute between counsel as to the quantum plaintiff’s attorney asked for. Appellants’ counsel say the figure was $80,000 while plaintiff’s counsel insists a lump sum of $60,000 was mentioned. We do not think that the jury was influenced by the unilateral argument on quantum for the reason the verdict reached was for a much smaller sum than either of the mentioned amounts. The judge had instructed the jury: “If * * * you should find that the plaintiff is entitled to a verdict, you will award him a sum which will compensate him reasonably * * * Furthermore, if the judgment is excessive this court is empowered to make correction (see Const. 1921 Art. 7, § 29) so that justice will be done in the case. See also C.C.P. art. 2164. The point under discussion is entirely different from that in Herbert v. Travelers Indemnity Company, La.App., 193 So.2d 330, decided by this court.
The accident happened at or about 2:00 p. m., April 20, 1964. There is much testimony pro and con as to the violence of the collision, a wide discrepancy existing in the testimony of the witnesses on the one side as compared to that on the other side. It should be mentioned in passing plaintiff, in attempting to demonstrate the severity of the collision, testified that his car sustained appreciable damage. However, he continued to use it without having it repaired. He says he obtained a written estimate of the cost of repairs, but could not produce the estimate when defendants’ counsel called for it. We notice that plaintiff made no claim for damages to his car although he made claim for 17 other particular items aggregating more than $400,-000. But, be that as it may, it is not necessary to resolve the controverted question because Dr. Soboloff, orthopedist, who examined plaintiff on behalf of defendants, testified that even though the collision be slight and one’s head flips back, this can cause significant trauma. Moreover, this court, at least on two occasions, has found that light impacts between motor vehicles could readily cause cervical injuries. See *409 McNulty v. Toye Bros. Yellow Cab Co., La.App., 73 So.2d 23 and Baird v. Employers’ Liability Assur. Corporation, La.App., 38 So.2d 669. It might be pointed out here that plaintiff never did say he was violently thrown against any part of the automobile or that he was cognizant of having suffered bruises or abrasions or felt pain when the collision occurred. He only said he “found” himself on the right side of the front seat rather than behind the wheel. After the contact plaintiff alighted from his vehicle in an angry and excitable manner, making no complaints to anyone of having been injured. He discussed the accident with the driver of the truck. He himself summoned the police and awaited at the scene for almost an hour before an investigating officer appeared. Later that •afternoon he ingested a common remedy for headaches. That evening he says his •eyes became blurred. The next morning plaintiff, professing to have had a headache, soreness and stiffness in the neck and poor vision, did not see fit to consult a physician but went instead to his lawyer who referred him to Dr. Louis A. Ensenat, a general surgeon, whom plaintiff did not know. Plaintiff was examined and re-examined by 11 doctors in all, two of whom treated him. Two of his physicians were not called as witnesses. Many X-rays were taken and plaintiff was subjected to innumerable tests.
Plaintiff presented a variety of complaints; some of his symptoms were objective, many others being purely subjective; he complained of soreness, stiffness and swelling in the neck, ringing sounds in the left ear, headaches, memory lapses, numbness of the fingers, disorientation, inability to unerringly convey food to mouth, inability to touch the end of cigarette with lighted match, inability to grasp an object without knocking it over, would “bump” into things, while lying down had sensation ■of falling forward, would gag when endeavoring to swallow food, double vision, low back pains, twitching of eye lids, a pulling of the eyes, dizziness, nervousness and apprehension, and loss of 30 pounds of weight. In regard to a number of the complaints there is no medical evidence whatsoever substantiating plaintiff’s assertion that the same resulted from the accident and we are inclined to the view plaintiff has overstated his case.
 He testified that prior to the accident he was in a perfect state of health and that the ailments and symptoms descended upon him afterward. His counsel seemed to take the position that whereas the complaints did not previously exist that the accident must be held to be the cause. Of course, this does not follow. The burden of showing by a preponderance of evidence a causal connection between the complaints and the accident rested squarely on plaintiff’s shoulders. For instance, plaintiff continually made the complaint of the ringing sounds in his left ear and while on the witness stand at the trial stated that the noises were present, so the argument is advanced that the accident was responsible. There is no doctor who testified as to the cause of this particular complaint. Plaintiff saw Dr. Goodman, an ear specialist, who is the assistant of Dr. Sonnier (who treated plaintiff for an eye condition) regarding the noises in the ear, but Dr. Goodman was not produced as a witness and his absence is unaccounted for. We believe that an inference must be drawn to the effect that had Dr. Goodman testified his evidence would have been unfavorable to plaintiff.
However, after a most careful analysis and sifting of the evidence we reach the conclusion that plaintiff did sustain certain injuries as a result of the truck having backed into his automobile.
On the day following the accident Dr. Ensenat, the general surgeon to whom plaintiff’s lawyer referred him, made an examination. At the time plaintiff held his head in a rigid manner and looked only forward. Dr. Ensenat found that the then rotation of the head, right and left, was limited in range to approximately 30% of *410 normal, accompanied by spasm of the posterior cervical muscles, particularly of the left side. The diagnosis was that plaintiff had a cervical (neck) sprain of a whiplash type. Dr. Ensenat attributed plaintiff’s condition to trauma sustained in the accident. Pain-killing drugs and muscle relaxants were prescribed and plaintiff was treated for a long period with ultrasonic therapy, diathermy and intermittent traction. Several days after the first visit Dr. Ensenat prescribed a surgical neck collar which the patient wore for a period of two months. In all Dr. Ensenat treated plaintiff some 75 to 90 times.
The next physician who saw plaintiff was Dr. Hyman R. Soboloff, an orthopedist, who examined him three weeks after the accident. Although Dr. Soboloff evaluated plaintiff’s condition on behalf of defendants he was called as a plaintiff witness. His findings were that the patient was extremely apprehensive and afraid to move for fear he would have pain in the neck. Dr. Soboloff admitted that plaintiff had a limited motion of the neck, much less than normal, and complained of pain about three-quarters of the way down into the neck, but no spasm of the muscle or anything wrong from an orthopedic standpoint was found. Dr. Soboloff seemed to think the complaints were not “legitimate” but “conceivable”. But, significantly, Dr. So-boloff thought that if the treatments being administered by Dr. Ensenat were not beneficial, plaintiff “might” be considered for hospitalization and head-halter traction (which is a mechanical pulling of the head to allow the patient to overcome the apprehension and to alleviate any tightness that might exist in his neck).
Dr. Ensenat also referred plaintiff to Dr. Rayburn Llewellyn, neurosurgeon, for examination from a neurological point of view. Dr. Llewellyn, who examined plaintiff twice, the first time about a month after the accident, appeared as a witness for plaintiff. Plaintiff, on his first examination, complained of blurred vision, headaches, stiffness and soreness of the neck and numbness in the fingers. Dr_ Llewellyn found cervical muscle spasm (am objective symptom) and while he felt there was nothing neurologically wrong it was. the doctor’s feeling that the complaints could represent the residual of a cervical spine sprain. He thought recovery would be made from 90 to .95% in three to six weeks. Dr. Llewellyn examined plaintiff again at a much later date (November 19, 1965) at which time the patient complained of a noise in his left ear, double vision, as well as continual and severe pain in the neck. Dr. Llewellyn’s opinion was that these complaints were not related to neurological problems resulting from the automobile accident. There was no specific nerve injury or spinal cord injury that would account for the complaints. There was no spasm present in the November examination. Dr. Llewellyn pointed out that the complaints regarding headaches, dizziness and cervical stiffness seemed to have lessened in November. However, Dr. Llewellyn was not inclined to “feel” that plaintiff distorted or magnified his complaints.
On June 15, 1964 (while under Dr. En-senat’s care), plaintiff, on his own initiative called on Dr. G. Gernon Brown, an* orthopedic surgeon, who examined him: Plaintiff had been wearing the neck collar prescribed by Dr. Ensenat and Dr. Browm said: “He simply would not move his neck, through any significant range of motion”.. Dr. Brown deemed plaintiff’s complaints-consistent with trauma inflicted by the accident. In November, 1964 when Dr.. Brown again examined plaintiff he noted spasm of the cervical musculature which, was an objective finding. He found also-that the complaints of pain in the lumbar area were also genuine and his examination of the dorsal and lumbar spines reflected that there was present spasm and a tenderness, the patient complaining of pain and palpitation over the lumbosacral-area.
On June 25, 1964 plaintiff was complaining to Dr. Ensenat of pains in the lower back in addition to his other complaints and *411 an examination disclosed to Dr. Ensenat that the patient had a mild spasm and pain at the level of the tip of the scapula (bone in the back of the shoulder) and also in the lower back at the lumbosacral joint .and the left sacroiliac joint. Dr. Ensenat stated that these conditions stemmed from the cervical injury and explained why. Dr. Soboloff, defendants’ doctor, also believed there was a connection between the .two conditions and explained why.
On July 8, Dr. Ensenat’s opinion was that plaintiff should be hospitalized in or•der that head-halter traction might be ap•plied, that opinion being bolstered by the ■recommendations of hospitalization which had been made by Drs. Brown, Llewellyn •and Soboloff. On said date plaintiff entered the hospital and remained therein for -a period of nine days. The head-halter traction seemed to have benefited the patient to some degree, but in August, 1964 the lower back condition assumed greater significance. At this juncture the cervical sprain had somewhat subsided and the lumbar strain and the left sacroiliac joint be•came much involved and so the treatments went on. In September, 1964 Dr. Ensenat ■prescribed a back brace which plaintiff wore for about two months.
From the above it will readily be seen bhat plaintiff did sustain a persistent injury ■of the neck which later superinduced the 'lower back trouble. There is no gainsaying that plaintiff must have suffered pain, anxiety, and many unpleasant treatments, the hospitalization and the discomfort of ■wearing a neck brace and subsequently a back brace. There is no suggestion the injuries are permanent. His cervical and back trouble seems to have cleared up. While it is claimed he is still under treatment by Dr. Ensenat, our reading of the record discloses that Dr. Ensenat last examined plaintiff in July 1965 (four months prior to the trial).
Plaintiff’s eye condition (diplopia or double vision) came in for much argument. Three eye specialists saw plaintiff. His vision was 20-20 (normal) in each eye when the other was covered. Dr. Walter C. Turnan who examined him at the request of Dr. Ensenat came to court as a defense witness. Dr. Turnan found that plaintiff was not holding his head straight; that the right eye was lower than the left and the eyes were diverged, that it extended outward and there was a lag and deficiency. There was no eye trauma. Dr. Tuman’s opinion was that the accident had nothing to do with the complained of eye condition and he attributed it to the position in which plaintiff held his head. Dr. Turnan stated: “A lot of that impressed me as being imagined.” He thought that proper lenses would correct plaintiff’s condition.
In August, 1964 plaintiff voluntarily sought out Dr. Julius Finklestein, an eye specialist, who examined him. All of Dr. Finklestein’s findings were negative for trauma or neurological damage. He stated that double vision is purely a subjective condition “in the patient’s mind”. He determined there was a remote PCD which means the muscles cannot pull the eyes in close at a certain distance and Dr. Finkle-stein thought this accounted for the double vision at close range but not at a distance.
About four months later (December 29, 1964) plaintiff on his own account went to see Dr. Earl Joseph Sonnier, eye specialist, whose first examination convinced him plaintiff’s claims of double vision were valid. Dr. Sonnier stated positively that plaintiff could not be pretending for he gave certain tests which would have inhibited any incorrect answers or assertions by the patient while undergoing the tests. The doctor’s considered judgment was that the accident was the most likely cause of diplo-pia and explained that swelling or trauma affects the nerves that control the muscles which in turn has an effect on the eyes. Dr. Sonnier did not state what swelling or trauma he referred to but he must have had the cervical sprain in mind as there was no swelling or trauma about the eyes or anywhere on the patient’s head. Pie *412 stated diplopia is frequently seen following accidents or any type of trauma. Dr. Sonnier stated that one of plaintiff’s eyes was looking “higher than the other”. Dr. Llewellyn, the neurosurgeon, also expressed the opinion that the blurred vision and the inability to focus the eyes “represent residual of a cervical sprain”. Dr. Brown, the orthopedist, likewise stated his opinion was plaintiff’s eye complaints were consistent with the type of trauma sustained in the accident. Dr. Sonnier saw plaintiff seven times in all and his course of treatment solely entailed the patient wearing a patch over one eye thus temporarily eliminating double vision. Plaintiff wore the patch seven months alternatively, from time to time, on one eye and then on the other. From the witness stand plaintiff continued to complain of double vision but significantly the record does not show that he was wearing the eye patch. The last occasion Dr. Sonnier saw plaintiff was about two months before the trial.
Thus, three eye specialists saw plaintiff. All three were contacted by plaintiff on his own volition. Drs. Turnan and Finklestein who merely made examinations did not believe plaintiff’s eye troubles were traceable to the accident while on the other hand Dr. Sonnier, who saw plaintiff over a period of several months, and under whose care plaintiff was, held the opinion that the accident caused the eye disorder. Dr. Sonnier’s testimony does not stand alone because Drs. Llewellyn and Brown, although not eye specialists, stated plaintiff’s eye complaints were consistent with the type of injury he sustained. The jury believed the testimony of Drs. Sonnier, Llewellyn and Brown and disregarded the testimony of Drs. Turnan and Finklestein. We can perceive of no good reason why we should now ignore the testimony of Drs. Sonnier, Llewellyn, and Brown with regard to plaintiff’s double vision and accept in its place and stead and adjudicate the case upon the statements of Drs. Turnan and Finklestein. We, as evidently did the jury, believe that the diplopia was one of the results of the accident. But it must be noted that Dr. Sonnier characterized the double vision as a temporary condition indicating it would desist when “whatever swelling or trauma that was there subsided”.
Plaintiff was also examined by two psychiatrists, a Dr. Olinde being the first to see him. The record does not show the date of the examination as Dr. Olinde was not called as a witness. We are inclined to believe that plaintiff either voluntarily went to Dr. Olinde or was sent to him by plaintiff’s lawyer. From the record it appears plaintiff was disappointed with the findings of Dr. Olinde and thus ended their relationship of doctor and patient.
Plaintiff’s lawyer, however, sent him to Dr. William Sorum, a psychiatrist, who saw plaintiff on two occasions, first in October and again in November, 1964. Dr. Sorum’s testimony gives us an insight as to the sort of individual plaintiff was. Pie presented myriad complaints and would have the doctor believe he had been in a terrific automobile crash. Dr. Sorum was of the opinion that plaintiff had emotional problems prior to the accident which were difficult to evaluate and he was more than normally affected by the accident for that reason as he displayed a general feeling of anxiety and self-consciousness. The doctor pointed out what he considered a very unusual relationship existing between plaintiff and his estranged wife. Dr. Sorum, other than the above, made no findings worthy of mention and was of the opinion that plaintiff would improve if he became the beneficiary of a settlement of his claim with the defendants. Dr. Sorum did mention, however, that he suspected in plaintiff’s “behavior some possible angry or even paranoid trends”. With reference to the latter, in a letter dated September, 1964 from Dr. Ensenat to plaintiff’s lawyer, mention was made that plaintiff was hypersensitive “with an overlay of paranoid”.
The question of quantum must now be considered. Plaintiff testified that physi *413 cally he was “almost back to snuff” except for the noises in the ear. He related that his neck is “alright” except on occasions when he “gets a little crick in it”, hut generally he felt “strong” and “good”. The evidence in the case makes it certain that plaintiff never had any hone pathology and that whatever injuries he sustained were of a temporary nature. Dr. Ensenat last examined plaintiff four months prior to the trial and Dr. Sonnier, who treated his eyes, saw him on the last occasion about two months before the trial.
Plaintiff claimed $6000 for the loss of wages. The record shows that during the ten years preceding the accident he had held seven or eight different types of jobs. He was only with his last employer (as an insurance collector and policy salesman) about a month when the accident happened. Plaintiff worked for a few weeks after injury and endeavored to return to the insurance company in May of 196S at the suggestion of Dr. Ensenat, but the employer refused to re-employ him. Plaintiff made no attempts to secure other employment because he says he considered himself still an employee of Union National Life Insurance Company on leave of absence. There is a significant fact and that is that plaintiff was able to drive his automobile after the accident and actually did so and there is also testimony to the effect that Dr. En-senat approved plaintiff’s application for the renewal of his driver’s license. It seems to us that plaintiff could have worked at some other employment during the tenure of his professed disability. Another circumstance which should necessarily be taken into consideration in determining the loss of wages is the fact that plaintiff was working strictly on a commission basis with the insurance company. He states that his earnings were between $85 and $90 per week and that he expected a raise. While plaintiff, because of his injuries, might have been incapacitated for some time we are unable to compute the actual duration of the disability.
According to our calculation, plaintiff’s medical expenses amounted to $2299.
The jury’s verdict, which was not unanimous (10 to 2), was for $19,000. In Louisiana there is no rule or standard by which personal injury awards can be measured, and the trial judge or jury has much discretion in the awarding of general damages for personal injuries, which discretion should not be disturbed by an appellate court in the absence of an abuse of discretion. Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So. 2d 64; Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149.
We feel in this case that the jury abused its discretion in the matter of the award. Our opinion is that a judgment for $14,000 would adequately compensate plaintiff for the injuries he has proven he sustained, for physical suffering and anxiety, the amount of wages lost, and for his medical expenses.
For the reasons assigned, it is ordered, adjudged and decreed that the second paragraph of the judgment appealed from which condemns Louisiana Pine Products, Home Charcoal Company and Merke S. Ay-mond jointly, severally and in solido, to pay plaintiff $14,000 is amended so as to provide that the amount be reduced to $9,000, and as thus amended and in all other respects the judgment appealed from is affirmed; cost of this appeal is to be borne by plaintiff.
Amended and affirmed.