This is a suit for the recovery of damages arising by reason of personal injuries alleged to have been sustained by plaintiff in an automobile collision.
About 12:30 o'clock, A.M., on December 31, 1946, petitioner was driving a 1940 Plymouth Coupe north on U.S. Highway 165. While traversing the highway overpass above the Missouri-Pacific Railroad tracks, near the town of Riverton in Caldwell Parish, the left rear portion of the Plymouth car was struck by the right rear of an Oldsmobile sedan driven by Kermit Youngblood, principal of the school at the Louisiana Training Institute in Monroe. The Oldsmobile was being driven in the same direction as plaintiff's automobile *Page 645 
and the driver, Youngblood, was engaged in attempting to pass the Plymouth car.
At the time of the accident visibility was bad due to rain and sleet which were falling at the time, and the overpass was slick with a coating of ice. The point of the collision was just beyond the crest of the overpass in the direction the cars were traveling.
The rear end of the Plymouth car was seriously damaged, and plaintiff alleges that he received an injury to his back as the result of which he seeks the recovery of damages in the total amount of $26,179.40.
Plaintiff was accompanied by one Nolan J. Justice, nephew of his wife. Plaintiff was the employee of Transway, Incorporated, and his duties consisted of servicing and transporting motion picture films between various picture theaters in North Louisiana. At about 10:30 P.M., on the night of December 30th, Burke and Justice had collected a number of films from the theaters in Monroe and had embarked on a trip to Winnfield, by way of Columbia, intending to pick up other films in these communities. After having proceeded toward Winnfield and crossed the overpass, the plaintiff, Burke, discovered he had left the keys to the theaters at Columbia and Winnfield in Monroe, and, accordingly, he turned the car around at a point some half mile beyond the overpass and began to retrace his route, during the course of which the accident occurred.
Youngblood accompanied by a cousin, Mrs. Bailey, was returning from Jena where he had been to take in charge an escaped juvenile from the Louisiana Training Institute, a boy, who, at the time of the accident, was asleep on the rear seat of the Oldsmobile car.
Shortly after the accident two other persons, Messrs. Scruggs and Heard, who appeared as witnesses on trial of the case, reached the scene and rendered assistance in towing the Plymouth car off of the overpass to a position on the side of the highway.
After trial on the merits there was judgment in favor of plaintiff in the sum of $8,679.40, from which judgment defendants, Youngblood and the liability insurer, Commercial Standard Insurance Company, have taken this appeal. Plaintiff has answered the appeal, praying an increase of the judgment to the amount sued for.
Close examination of the record fails to reveal any serious conflict of testimony with respect to the circumstances surrounding the accident.
At or about the crest of the overpass it seems that the Plymonuth car skidded, in the course of which it turned crosswise of the overpass. This fact was observed by both Youngblood and Mrs. Bailey at a time when Youngblood's car was several hundred feet from the Plymouth car. Youngblood was driving at a speed of about 35 miles per hour when he reached the foot of the overpass. Although both Youngblood and Mrs. Bailey testified that they were traveling at a very slow rate of speed when they reached the crest of the structure, we think the facts bear out the conclusion that the speed had not been decreased to a point commensurate with safety. According to Youngblood's own testimony, when he began the ascent of the overpass, he touched the brake with his foot and his car began to skid. As a result he was unable to bring his car under proper control to such extent as would permit stopping its progress.
It is quite clear that at the time Youngblood began his passing operation the Plymouth car was well on the right and there was more than sufficient room for the execution of his plan. But after the front portion of the Oldsmobile has passed the Plymouth the left rear of the Plymouth, due to some cause not definitely established, came in contact with the right rear portion of the Oldsmobile, causing considerable damage to both cars. As a result of the impact, the Plymouth car was thrown to the right into the railing of the overpass and Youngblood's car careened first to the left and then to the right before it was finally brought to a stop at a distance of some 200 feet, more or less, from the Plymouth car which had been brought to a halt within a distance of approximately 20 feet. *Page 646 
Under our appreciation of these facts there can remain no doubt as to the negligence of the defendant, Youngblood. The extremely unfavorable and dangerous weather conditions, the treacherously icy surface of the overpass, the observation by Youngblood of the difficulty being experienced by plaintiff's vehicle in negotiating the overpass, and the obvious possibility of the development of an emergency by reason thereof, are all facts which indicated the absolute necessity for the exercise of the highest degree of caution. A speed of 35 miles an hour on the part of the following car under such conditions was clearly excessive. We think it is obvious that, when Youngblood experienced the danger arising from his attempt to brake his automobile, the passing maneuver became a necessity in the attempt to avoid an accident. The cause of the actual collision between the cars was not satisfactorily established and might have resulted from any one of a number of possibilities. But even if the Plymouth car driven by plaintiff skidded, as alleged, into the Youngblood car, this in itself is not proof of negligence on the part of the plaintiff, Burke. There is no question as to the fact that Burke was driving at a very slow rate of speed and was proceeding as cautiously as was possible under the existing conditions. We find no evidence in the record which would sustain the plea of contributory negligence against plaintiff which has been raised by defendants.
We are firmly of the opinion, as a question of fact, after careful consideration of the testimony with reference to all the circumstances and conditions, that the negligence of the defendant, Youngblood, was the direct and proximate cause of the accident and that the plaintiff, Burke, was not guilty of any contributory negligence.
There remains for our consideration the further defense, to the effect that the plaintiff, Burke, did not sustain injury resulting from the accident. This point presents a serious and difficult problem.
The injury alleged involves the lower part of plaintiff's back. The allegation of the petition sets forth particular injury to the "muscles, tissues, ligaments, nerves and bones structure of the lower spine and hip region, causing permanent impairment of the nerves, tissues, ligaments and bones [sic] structure thereof and specifically rupturing the nucleus pulposus of the 5th lumbar intervertebral disc".
The expert witnesses tendered by plaintiff were Dr. W. E. Jones, a general practitioner, who first examined plaintiff following the accident, and who treated him for a number of months thereafter, and Dr. A. Scott Hamilton, a specialist in orthopedics.
The medical witnesses on behalf of defendants are Dr. John G. Snelling, Jr., and Dr. Henry E. Guerriero, Sr. The testimony of the witnesses for plaintiff and defendants respectively is hopelessly conflicting and irreconcilable, a not unusual occurrence, particularly in cases involving injuries of the nature herein alleged.
In order for plaintiff to be entitled to recover damages it is necessary that he shall have established two facts by a preponderance of the evidence; first, that he is suffering from an injury, and, second, that the injury resulted from the accident which is the basis of this action.
We are satisfied that plaintiff has successfully discharged the burden of proving the first point, namely, that he has suffered some injury which has affected his back to a greater or lesser degree.
But it is with respect to the resolution of the second point that we have encountered serious difficulty, in the discussion of which it becomes desirable to analyze the salient points of the testimony of the witnesses.
According to the testimony of Dr. Jones, on January 2, 1947, some two days after the accident, the plaintiff presented himself to the physician for examination and treatment, giving a history of an injury to his back in an automobile accident "the night before". The doctor found no lacerations or abrasions. X-ray pictures were made of plaintiff's back and it was found that he was suffering from arthritis, which was treated by strapping and the prescription of analgesics. The doctor found some abscessed teeth and plaintiff was referred *Page 647 
to a dentist, who discovered that all of his teeth were abscessed, whereupon he began the immediate operation of extraction. Dr. Jones testified:
"Although his teeth were extracted he continues to have some pain in his back as the result of the old arthritis that he has, as demonstrated by the X-ray."
Dr. Jones saw this patient nineteen times between the dates of January 2nd and November 25th, 1947, and it was only on the latter date, according to his testimony, that he first considered the possibility of damage to an intervertebral disc. After this possibility was called to his attention, the doctor concluded that there was damage to the intervertebral disc between the 4th and 5th lumbar vertebrae. In answer to a question by plaintiff's counsel as to the cause of disability, the witness answered as follows:
"The absorption of pus from his mouth over a long period of time bringing about an arthritic and possibly a neuritic condition and also the possibility of a damaged intervertebral disc. I am not assume that the pus has had anything to do with the damaged intervertebral disc. I did not suspect an intervertebral disc in this man's case at all because theinjury that he had received was not of a sufficient severity tohave brought about, in my opinion, a damaged disc, but the physical findings now fit in very nicely with the damaged disc." (Emphasis by the Court.)
The gist of the above quoted testimony was reiterated by the witness, who further declared that he did not consider himself thoroughly competent to make a diagnosis of a damaged intervertebral disc when it was "confused by the arthritic agent as demonstrated in this case".
Proceeding to a discussion of the testimony of Dr. Hamilton, we are convinced of his absolute certainty as to the fact that the plaintiff was suffering from a herniated intervertebral disc. Dr. Hamilton first examined the plaintiff on April 28, 1947, since which time he had seen the patient, according to his recollection, on an average of every three weeks up to the time he gave his testimony on December 3, 1947
The following extract from Dr. Hamilton's testimony on direct examination appears to us to be most illuminating:
"Q. Can a ruptured disc be caused by disease? A. Yes, sir, it can be, there isn't any way that I know of to prove whether it is caused by disease, by degenerative changes or when it is due to an injury except by believing what you find in the historyof the patient with respect to the time of the on-set of thepain. There are many herniations which are present during the latter part of a life of an individual which give no symptoms whatever. On the other hand we know that slight protusion of the nucleus pulposus will produce extremely severe symptoms. It depends primarily upon the location of the herniation within the canal with respect to the spinal nerves which they emerge therefrom." (Emphasis by the Court.)
The following question and answer are found in the course of cross-examination of the witness:
"Q. If you are correct in the diagnosis that this is what the man has it could have been caused by his heavy lifting of these objects and this had been a recurrence of that and not necessarily caused by this injury which he states he had? A. It could have been caused by a large number of things. In fact we know very definitely that some people have the final push given by sitting in a chair. The thing has been there before and thefinal thing is some minor proposition." (Emphasis by the Court.)
In the course of further cross-examination the following appears:
"Q. I understand that, if you he correct in your diagnosis, that this ruptured disc was caused from an accident which he claimed to have been in on December 31st? A. I base my opinionon probability, in other words, if a man has a severe injury, based upon his statement and I find that the condition could have resulted therefrom, it then becomes my opinion that it did, in the absence of any other injury which might have caused it." (Emphasis by the Court.)
We are impressed with the fact that the value of Dr. Hamilton's testimony in the *Page 648 
instant case must be weighed in the light of the history upon which he predicated his diagnosis. The outline of the patient's history, as given by Dr. Hamilton in his testimony, is as follows:
"A. He stated that his back had been injured on or about December 31, 1946 in an automobile accident. He said the accident resulted as another car skidded —
"Mr. Thompson: I object to the testimony by the doctor on any facts which Burke has stated to the doctor in that it is irrelevant and immaterial and purely hearsay.
"And its rear end striking his on the left front. At the time he did not consider his back was seriously hurt but gradually pain increased, being particularly evident in the lower portion. This pain increased to such an extent that he sought medical attention and later came to me when the result of the treatments were not particularly favorable. At the time that I saw him he said that his pain was confined to the lower back and had no radiation downward to any extent. He was unable to bend or stoop. Changes in the weather had no noticeable effect upon his back pain so far as he observed. Coughing and sneezing slightly increased the pain. Walking aggravated the backache. Standing in a relaxed position gave some relief from the symptoms. Sitting or standing in a strained position caused marked stiffness of the lower spine. There had never been any numbness of the legs or any significant weakness. He further stated that he had been unable to work at his usual occupation since the accident, his hands not being steady as they had been previously. He had some difficulty in going to sleep. He had noticed that he had more nightmares. All of the statements made by me were given as part of the history of the case and do not pertain to any facts which I am able to prove.
"Q. Upon this examination what was your diagnosis? A. The diagnosis was not made until physical examination was done and X-rays were made.
"Q. Did you have X-rays made at that time? A. I requested that X-rays be made as soon as it was convenient for Mr. Burke and they were made on the third of March.
"Q. They had been made previously or the 3rd of March? A. They were made available to me and I studied them.
"Q. Did you find any pathology in the X-ray? A. Yes, sir, there was some pathology which, however, I did not consider this as having any particular bearing upon Mr. Burke's complaint. He showed some hypertrophic arthritic changes involving the joints of the third, fourth and fifth lumbar vertebra. The changes were moderate and at the time I considered them more a manifestation of hard work, which Mr. Burke stated that he had performed all of his life than due to any injury that he had received.
"Q. You stated that you made subsequent examinations of Mr. Burke and have examined him further, what is your diagnosis at the present time of Mr. Burke's ailment? A. I believe Mr. Burke is suffering from a recurrent herniation of the third lumbar intervertebral disc.
"Q. Could such a condition have been brought about from the injury that he described to you? A. Yes.
"Q. Then from the history that he gave, what was your opinion as to the relation of the accident to his present condition? A. I thought that the accident could have caused this recurrent herniation, at least the original herniation. Of course, subsequent herniation would result from any type of over-activity.
"Q. Accepting his history you reached the conclusion that the disc ruptured at the time of the accident and that the nucleus pulposus has recurrent protrusion into the canal causing his pain and difficulty? A. Yes."
It is significant that Dr. Hamilton's narrative of the plaintiff's history contains no reference to the fact that Dr. Jones, on the basis of X-ray examinations, had found arthritis; that plaintiff had suffered from abscessed teeth and had his teeth removed, nor to the fact that an examination made within a brief period after the accident disclosed no external evidences of injury. *Page 649 
Turning to testimony of the medical experts tendered by defendants, we find that Dr. Snelling, who made his examination of plaintiff on March 5, 1947, which was almost two months before plaintiff was examined by Dr. Hamilton, found no evidence of any injury to an intervertebral disc. This witness testified that the diagnosis of a ruptured intervertebral disc or the herniation of the nucleus pulposus produces a very definite clinical picture which a careful physical examination should denounce; that he made a complete and thorough physical examination; that he had X-rays made; that he received X-ray reports, and that he found no evidence of injury to the intervertebral disc. The doctor did find a degree of arthritis. His diagnosis was that plaintiff had sustained a lumbosacral strain of moderate degree, from which he would recover sufficiently, after a few weeks, to resume his former occupation.
Dr. Guerriero made a thorough examination of plaintiff on September 25, 1947, by reason of which he arrived at the conclusion that at the time he was suffering no disability as the result of the accident which he had related in giving his history.
In support of his claim of injury and attendant pain and suffering, plaintiff tendered the testimony of several witnesses, namely, his wife, Justice, his wife's nephew, who was his companion at the time of the accident, and one Barnett, a friend of plaintiff's daughter. These witnesses all testified to the effect that plaintiff had consistently and continuously complained of pain in his back since the time of the accident.
The value of this testimony is considerably lessened by the fact that each of the witnesses referred to had some definite interest, by reason of relationship or otherwise, in this cause. Justice, in addition to being related to plaintiff's wife, is shown to have a very substantial personal interest in the outcome of this suit, inasmuch as there appears in the record an assignment from Burke, plaintiff, to Justice and one Hollis Cruse, a brother of plaintiff's wife, of an interest and equity in all sums realized from plaintiff's claim against these defendants to the extent of $3,200.00. In addition, Justice claims to be the owner of the Plymouth automobile which Burke was driving, and appears as plaintiff in another suit, which is also before this Court, and in which judgment has this day been rendered. Justice v. Commerial Standard Insurance Company et al., La. App., 38 So.2d 240.
In refutation of the testimony of these interested parties on this point, defendants tendered as a witness in their behalf one E. J. Davidson, the operator of a filling station with whom Burke had transacted his gas and oil business for a considerable period of time, particularly including the months of September, October and November, 1946. This witness testified that plaintiff on several occasions complained of suffering from pains in his back, and, specifically, in the latter part of October, 1946, declared that he was afraid he was going to have to give up his job because of his difficulty in handling the films, which weighed from 35 to 90 pounds. True, it was brought out on cross-examination by counsel for plaintiff that the witness, Davidson, was a creditor of plaintiff to the extent of an unpaid gasoline bill, but, in itself, we do not feel that such a circumstance is sufficient to discredit the very pertinent testimony with respect to plaintiff's disability and the pain and suffering arising therefrom, at a time antedating the accident by some months.
In addition to the testimony of the lay witnesses, which we have related above, we are further inclined to accord considerable weight to the fact that the plaintiff, Burke, an employee of Transway, Incorporated, by joint petition with his employer, entered into a compromise settlement which was duly approved and judgment rendered by the Court on the 9th day of April, 1947, under the terms of which settlement plaintiff accepted the total sum of $660.00 in satisfaction of his claims under the Workmen's Compensation Laws of this State. Act No. 20 of 1914, as amended. Such a settlement ill accords with the strenuous assertion of plaintiff in this suit as to the serious nature and results of his alleged injury, and it is most difficult *Page 650 
for us to reconcile plaintiff's willingness to accept a pittance of some $600.00 in settlement of a claim which, if his contentions be accepted in the present case, comprehended total disability. Surely a proceeding under the liberal provisions of our compensation statutes which, if successful, would have resulted in judgment in favor of plaintiff for compensation at the rate of $20.00 per week for not more than 400 weeks, was a consideration not lightly to be set aside in a weighing of values, as opposed to the obvious chances and uncertain results of litigation under a tort proceeding.
Further militating against the probability of an injury arising as a result of the accident sued on are several circumstances which transpired at or about the time of the accident. Among those which we regard as most significant is the fact that not a single one of the seven persons who were upon the scene observed evidences of any injury or heard any complaint of injury by plaintiff with the single exception of Justice, with whose testimony on this point we are not impressed. And, further, the testimony of Youngblood is positive to the effect that Burke voluntarily declared that he had not been hurt. This purported declaration is in keeping with Burke's actions following the accident for, according to his own testimony, he immediately got out of his car and walked down the overpass some 200 feet where he met Youngblood, walked back to his car, and then was engaged, upon the arrival of Scruggs and Heard, in assisting in moving his car and securing transportation back to Monroe. We seriously doubt, if Burke had sustained any severe and painful injury as he contends, that he would have been likely to engage in all this activity and to have had contact with so many different persons without showing some obvious evidences or making some frequent mention of the injury.
Reverting to a consideration of the effect of the testimony of the medical experts, after thorough study we are convinced that there is no definite, certain nor positive linking of Burke's alleged disability with the accident itself. The doctors who testified on behalf of plaintiff accepted without question the history related to them by Burke himself and we have above called attention to some of the more important discrepancies and omissions as between this narrative and the true facts. And, too, even after conceding the most favorable interpretation to the testimony of Dr. Hamilton, and assuming the correctness of his diagnosis of a herniated intervertebral disc, the fact still remains that such an injury could have resulted, and, as we think, most likely did result, from some mishap or development entirely without any relation to or connection with the automobile accident.
The burden of establishing his injury and the cause thereof rested squarely upon plaintiff, and, in our opinion, he has signally failed to discharge such burden by the requisite preponderance of evidence.
For the reasons assigned the judgment appealed from is reversed and set aside, and there is now judgment in favor of defendants, Commercial Standard Insurance Company and Kermit Youngblood, rejecting plaintiff's demands, together with all costs.
 On Rehearing