ANTONIO PORTILLA ET AL., Plaintiffs and Appellees, *v.* CARMEN ANA CARRERAS SCHIRA and her husband, PEDRO SCHIRA GILOT, Defendants and Appellants.

No. R-65-146.        Decided March 8, 1968.

*Rafael Hernández Colón, Ramón A. Gadea Picó, José A. Hernández Colón,* and *Ramón E. Bauzá Higuera* for appellants. *Carlos J. Irizarry Yunqué* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

We conclude that the accident in this case caused a fibromyositis in appellee María Luisa Martínez Portilla [*sic*] and in virtue thereof the judgment of the trial court will be modified to reduce the compensation for the physical injuries suffered by her from $8,000 to $2,000, and attorney's fees to $400. The grounds for this judgment arise from the analysis of the circumstances of the case which we shall recite below.

## Facts of the Case

On July 24, 1962, at 8:00 p.m. appellant Carmen Ana Carreras Schira arrived at Jobos Street in Ponce driving her car, which she parked in an unoccupied space behind a Volkswagen already parked there. After appellant parked her vehicle and as she alighted she noticed that one of her tires was trapped on the curve of the sidewalk, for which reason she again got in the automobile to park it better. When she started the automobile, it unexpectedly leaped forward and collided with a Volkswagen (Kharman Ghia) which was in front. As a result of the impact the Volkswagen in turn moved forward and collided with a Ford parked in front. There was another vehicle parked in front of the latter which was not hit in turn by the Ford as a result of the impact that it suffered. María Luisa Arzola Portilla and her minor children were sitting in said Ford waiting for her husband who was visiting a relative in Clínica Dr. Pila. Appellant alighted from her automobile and offered to compensate the damages caused to the Ford, thus accepting her liability for said accident. The automobile was repaired in Garage Fao in Ponce, at the expense of the Fireman's Fund Insurance Co., appellant's automobile insurance company,

and it was picked up by Mrs. Portilla on October 13, 1962, following her husband's instructions. On that day she signed a document relieving the insurance company and appellants herein from all subsequent liability as a result of said accident.

On January 4, 1963, appellees filed an action for damages against Pedro Schira Gilot, his wife Carmen Ana Carreras Schira, and Fireman's Fund Insurance Co., alleging, in synthesis, that as a result of the aforementioned accident, coplaintiff Antonio Portilla's automobile had suffered damages for the amount of $314, $54 of which were for repairing the vehicle, which repairs had been paid by the insurance company; coplaintiff María Luisa Arzola suffered an injury diagnosed as "Fibromyositis paranectebral muscle on the thorac lumbar spine bilateral" and the damages amounted to the sum of $5,000; and minor Antonio Portilla, Jr., suffered a cut on his left knee and his damages amounted to $2,500.

Defendants answered denying the facts alleged in the complaint. After the proper proceedings the trial was held on December 3, 1963.

On the day of the hearing, appellee's attorney requested leave to amend the complaint to allege that the injury had been a herniated disc and to claim $15,000 for damages. Defendant's attorney *acquiesced* to said amendment and the court permitted it.

The trial court rendered judgment on June 30, 1965, sustaining the complaint as to the cause of action of the conjugal partnership constituted by Antonio Portilla and María Luisa Arzola Portilla and ordered Pedro Schira Gilot and his wife Carmen Ana Carreras to pay to plaintiff and his wife the sum of $89 for the damages and nonuse of the automobile and $8,000 for appellee's physical injuries and sufferings, and mental anguish, and besides the sum of $170 for treatment expenses. It dismissed the complaint as to codefendant

Fireman's Fund Insurance Company because "It was included in the title of the complaint and in the prayer and nowhere else. The evidence did not supply this omission . . . said co-defendant denied in its answer all the averments of the complaint and plaintiff having the burden of proof of the liability of said party, it does not seem to us that, on the basis of said facts, we could conclude that plaintiff has complied with said liability." The court also dismissed the complaint as to the cause of action of minor Antonio Portilla, Jr. It ordered defendant to pay $800 for attorney's fees.

### Assignments

Feeling aggrieved by the judgment rendered, defendant, in support of her appeal, assigns the following errors:

1st. The determination of the trial court in the sense that there is a relation of cause and effect between the accident of July 24, 1962, and appellee's alleged suffering is evidently erroneous because it is openly contradicted by other findings of facts made in the judgment itself and by appellee's evidence.

2nd. The conclusion to the effect that appellee María Luisa Arzola Portilla suffered a herniated disc is a gross error, manifestly mistaken and does not represent the most rational, juridical, and fair weighing of the evidence, the sole and clear conclusion being, according to the surrounding circumstances of the case which appear from the record that this small accident has been used by persons having the available means, to capitalize, by using an imaginary injury which has only been diagnosed on the basis of alleged pains which appellee supposedly suffers without utilizing any of the positive methods of modern science to deal with these cases.

3rd. The compensation for the sufferings and inconveniences caused by the supposed injury—$8,000—is absolutely out of proportion with said discomfort and inconveniences.

4th. The imposition of attorney's fees is not justified because there was no obstinacy whatsoever since liability was always accepted and the court itself dismissed two of the claims presented by plaintiffs, to wit: the claim against Fireman's Fund Insurance Company and the claim of minor Antonio Portilla, Jr.

### *Discussion of the Aforementioned Assignments*

1. First, let us consider the controversy as to whether or not appellee had a herniated disc. In support of her second assignment appellant argues that:

(a) the original complaint was based on a fibromyositis injury notwithstanding appellant had knowledge of the herniated disc diagnosis made several months before. At the trial appellee asked leave to amend the complaint in order to state that the injury was a herniated disc and to increase the claim to $15,000. It appears from the record that appellants expressly yielded to said amendment.

(b) The only damages suffered according to a note written by appellee Portilla refer to those suffered by the vehicle. No reference was made to those suffered by appellee. This may be explained by appellant's testimony which follows:

"Well, I told Portilla to tell me which were the damages suffered by the Kharman Ghia, from the impact. I told him: *'make a report on your car . . .'*

"I told him: 'Portilla, *check your car,* jot down any damage, any other detail, to report it to my insurance company . . .'

"I told him: 'Anyway, please jot down on a piece of paper in your own handwriting *the damages which this accident has caused to your car.* Give me your address and the list of the damages to report them to my company.'" (Italics ours.)

(c) The document releasing the insurance company and appellants from all liability for the accident in question was signed by the injured lady more than a month after having

knowledge of Dr. Brinz' diagnosis to the effect that she was suffering from a herniated disc for which reason it is not possible that she went to sign such document if she actually suffered such injury.

From the transcript of evidence it appears that when appellee went for the automobile following orders of her husband and signed the aforementioned release, extrajudicial claims for injuries and physical damages were being made. It also appears that since July 30, 1962, six days after the accident, Mr. Matos had already addressed the insurance company in relation to said claims. Furthermore, these facts were stipulated by the attorneys of the parties.

On the other hand, the evidence shows that appellee never read the document and she believed that what she was signing was "that I was retaking my car," which is not unusual. We are not convinced that in signing said release the injured party did it with full knowledge of what she was signing.

(d) That the diagnosis of the herniated disc was made by Dr. Brinz exclusively on the basis of a neurological examination; that that was the most rudimentary manner of doing it; that the most accurate manner is by a myelogram; that appellee has not been submitted to a myelogram and does not intend to do so, and she did not testify that she suffered pains in 1965.

The problem with this contention lies in that the medical authorities, Dr. Brinz, appellees' expert witness, and Dr. Feliciano, appellant's expert witness, do not support it.

According to medical authorities the myelogram is indicated as a preoperative measure to know the exact location of the disc. Samuel Brook, Injuries of the Brain and Spinal Cord 602 (4th ed. 1960).

Dr. Héctor Feliciano, expert witness presented by appellant, testified that a myelogram is taken when a herniated disc is suspected, the condition of the patient does not improve, and "it is suspected that surgery is necessary. . . . .

One does not undertake to operate unless a myelogram is taken. . . . After I reach the conclusion that the person has a herniated disc and it is considered that an operation is necessary, a myelogram is taken. . . ." When asked if he were suffering from backache and if he suspected a herniated disc, would he have a myelogram taken, he answered: "If it is causing me discomfort, I would have it taken, if I feel no pain I would forget about it."

Dr. Joseph Brinz, appellees' expert witness, testified that: "[the myelogram] Its purpose is to help localize the disc and to determine whether there is more than one herniated disc . . . [that he recommends a myelogram] because I had in mind to operate on her . . . I told her that a myelogram had to be taken for surgery."

From the expert witnesses' testimony it is inferred that the myelogram is not essential for a herniated disc diagnosis. The authorities aforecited are also of the same opinion. See also, 7 Averbach, Gair, Tuby, Handling Accident Cases 184 (1963 ed.).

So that the trial court did not err in concluding that "plaintiff's refusal to have a myelogram taken is of great importance from the point of view of the exact location of the herniated disc, for the purposes of an operation."

(e) Appellant maintains that she wonders why appellee did not testify in 1965 that the pains she suffered in 1963 still subsisted. From the transcript of evidence it does not appear that said question was asked to her. We do not see why appellant is surprised that on that date appellee did not feel any pains, since she was not asked if she did.

(f) Appellants argue that the injured party has refused to submit herself to the operation of the herniated disc up to now. She explained it by saying that she was afraid to undergo the operation. Because of that fear she came to San Juan to verify Dr. Brinz' diagnosis with Dr. Longo. That is comprehensible if we consider that, according to

Dr. Brinz, even if the operation is successful "the back will not be as strong as before. There will be a certain limitation. No violent exercises can be performed and heavy objects cannot be lifted.".

(g) The X rays taken to diagnose the injury were negative. According to medical authorities herniated disc injuries are not necessarily always to be seen on X-ray plates. Averbach, Gair, Tuby, Injuries of the Brain and Spinal Cord 625, *supra*; René Coillet, Low Back Pain Syndrome 212–213; *Baird* v. *Employee's Liability Assur. Corp.*, 38 So.2d 669, 673 (La. 1949).

(h) That Dr. Brinz' diagnosis is based on erroneous information offered by appellee.

We shall discuss this question later in subdivision 2.

(i) That the hospitalization in January 1963 was due to *trilafon* intoxication and Dr. Brinz only attended the case as a consultant.

According to Dr. Brinz' testimony the case was attended by Dr. Fernández Durán as well as by himself. Dr. Fernández Durán took care of the intoxication and Dr. Brinz was called to treat the backache. From the medical record introduced in evidence it appears that that was the truth and it was not rebutted by appellant.

(j) That appellee was never submitted to traction treatment nor was she recommended the use of orthopedic corset.

It appears from the evidence that appellants' attorney asked Dr. Brinz the following general question: "Do you make any recommendation to her?" And he answered: "A specific recommendation can be made to her; First, to use a piece of board under her mattress and not to exercise voluntarily; to apply the medicine, muscular relaxants, heat on her back, and the wearing of high heel shoes is not recommended."

However, in this cross-examination appellants' attorney did not insist on this point, but led him to another question.

If he failed to ask the question in relation to traction treatment and orthopedic corset he cannot know whether said kind of treatment was administered.

2. Let us consider now the first assignment.

■ The expert evidence in relation to the nature of appellee's injury caused by the accident in issue is conflicting. This frequently occurs in this type of case. The trial court gave credit to the testimony of the neurologist, Dr. Brinz, to the effect that the aforementioned injury consisted of a herniated disc. We agree with the trial court as to the weighing of the expert evidence. *Ortiz Rodríguez* v. *Water Resources Authority*, 94 P.R.R. 521 (1967).

■ Prior to the analysis of such evidence it is necessary to lay down that appellees bear the burden of establishing, by a preponderance of the evidence, the nature of the injury suffered by appellee and the causal relationship existing between said injury and the accident caused by appellant's negligence. *Burgos Quiñones* v. *Water Resources Authority*, 90 P.R.R. 597 (1964) ; *Moore* v. *Glasgow*, 366 S.W.2d 475, 483 (Mo. 1963) ; *Burke* v. *Commercial Standard Ins. Co.*, 38 So.2d 644, 646 (C.A.2d La. 1949).

Let us see the evidence in question. Dr. Rafael Acosta Olmedo and Dr. Héctor Feliciano agreed that the injury in question was a fibromyositis. Dr. Feliciano testified that he examined appellee on September 22, 1963, and that:

"According to the record the patient, thirty-three years old, had been involved in an accident on July 24, 1962, she was in a car which was parked. . . .

"Immediately after the accident she had no injuries, symptoms, but a few days later she felt a pain in the back, in the lumbar region, which radiated through the lower back and which was more intense on the left side. Then, on July 27, 1962, she visited a doctor in Fort Allen who diagnosed a 'fibromyositis.' Then X-ray plates of the lumbar region were taken and according to the report they showed negative. The pain was intermit-

tent and it varied from slight to severe. Her condition improved with muscular relaxants.

"Then, she continued to have attacks of pain since the accident which may last several days. She was hospitalized in August 1962 by Dr. Brinz because she suffered pains and she was also examined by Dr. Longo.

".                                 .

". . . they also suggested the operation of a herniated disc; that they suggested a myelography which she said she would not undergo. Her own words 'ad verbatum'. Then after the treatment she said she had been put on an orthopedic bed. . . . The physical examination: 33 years old, well developed, the sthenic type, that is, tall, well developed, thin, long extremities; blood pressure, one hundred ten over seventy, pulse 88, respiration 18. The ophthalmologic test showed negative. The pupils reacted normally to light and to accommodation; chest and heart showed negative. On the back there are no spasms or limitation of movements. The neurological examination reveals a negative Lasegue team; the patellar reflexes are normal; there are no pathological reflexes, including the normal dorsiflexion of the toes. My impression after considering the history and the physical examination is that the patient suffered a contusion on the back as a result of a 'jarring motion'. When a parked automobile is struck by another the person inside moves from one side to the other, like when there is a whiplash. My impression is that that was what happened and it caused a traumatic fibromyositis in the lumbar region."

When asked whether a fall in a bathtub some months before, the movements she has to perform as the mother of some children, after receiving that injury, could result in an injury in a disc, he answered:

"I think so. Specifically there is another factor which we have not mentioned up to now, which is that every person's spinal cord and discs begin to degenerate after twenty years of age. She is thirty-three. And if she has that kind of 'body building', the degeneration is more progressive. Then the factor of the person's posture, the wearing of high heels, the daily activities, all that could cause a herniated disc in a person."

He explained a fibromyositis as follows:

 "a thoracolumbar 'fibromyositis' refers to a nonspecific inflammation; by nonspecific I mean that it is not caused by bacteria or by a known agent, but by an unknown inflammation of muscles and tendons of the thoracolumbar region. These inflammations are marked by a microscopically swelling of the muscle and tendon and an invasion of red and white corpuscles in the muscle and tendon, and there is pain, local inflammation. Sometimes the temperature varies, the area gets warmer and it is a self-limited inflammation which may last several days or two weeks. Generally it is caused by trauma or emotional diseases."

He added that the movement to which appellee was exposed could have produced a whiplash injury in the cervical spine, that is, between vertebrae one and seven, but in this case it was not produced. On cross-examination he affirmed his diagnosis of traumatic fibromyositis, which causes a three-week disability with pain; that "those pains which [appellee] still feels are not related to the accident." He stated that he was sure of that and that when he examined her she did not have any herniated disc. He added that "There is a great number of persons who complain of backache and it resolves an emotional conflict, especially if a 'litigation' is involved."

    On the contrary, the neurologist, Dr. Joseph Brinz, testified that in August 1962 he performed a neurologic examination on appellee; that "The patient complained of an intermittent backache which radiated to the left inferior extremity. . . . Well, *the story she told* was that she had been in an automobile accident. Her car had been struck; then she went forward *and she started to feel backache since the accident, and henceforth the pain became more severe.*" (Italics ours.) "In brief, the lady has a herniated lumbar disc on the left side exerting pressure on the roots of the left side." When asked on what he had based said diagnosis, he said:

 "Several findings; first, that the Achilles tendon reflex of the left side has diminished.

"

"Less intensity than on the right side; an impression of feeling a movement from the foot to the ear excited by the blow upon the Achilles tendon.

"

"She has a hypalgesia, she has decreased sensitiveness dermatome L-5, S-1, 2 and 3. Dermatomes are the different skin areas of the leg delimited by different sensory nerves. That is, root L-5, one means anatomically, that it supplies blood to the lateral part of the leg and then S-1, to the toes 1, 2, 3 and sometimes 4, part of the foot and the thigh. This is the posterior part of the thigh.

"Mr. Irizarry:

Hypalgesia means decreased sensitiveness?
Yes, sir.
Is that like a numbness in that area?
Yes, sir.
Does she have sensitiveness on the right side?
Yes, sir.
Does she have less sensitiveness on the left side?
Yes, sir.

"

"A sensation of pulling that when the person raises his leg the pain is produced in the back, in the thigh, and in the leg. That is important. When a person gives a false sign he tries to say that he has considerable pain in the back. As he does not know the complete mechanism."

He was interrogated as to whether he saw any relation between the herniated disc and the accident suffered by appellee in July 1962. He answered that: "Well, what is accepted as to herniated disc is that the majority of herniated discs are caused by a trauma or multiple traumata"; that actually "he saw" a relation of cause and effect between the herniated disc in this case and the aforementioned accident. He was asked the following question: In the case of this lady, assuming she feels a blow and then suddenly a violent jarring which suddenly sends her headlong from the

front seat where she is sitting, can that produce that injury in her lumbar vertebra? His answer was: "Yes, sure." He denied that the herniated disc was caused by a degenerative process.

In our opinion, Dr. Brinz' testimony was weakened and became less credible by the other elements of the evidence as a whole, which we recite below.

(a) the injured party testified that in February or March 1962 she slipped and fell flat in a sitting position, it was not a bad fall; she felt pains in her back later for which reason she went to see Dr. Acosta. She was told she was alright. On this particular Dr. Brinz was cross-examined as follows:

"MR. HERNÁNDEZ:

If I inform to you that in February 1962 María Luisa Arzola suffered a fall in her bathtub where she fell in a sitting position, which fall produced a pain which caused her to visit a doctor and which persisted for several days, could you tell me whether you find any relation between said trauma and the normal traumata suffered by her disc in the incidental chores of her daily life, and her present condition?

"WITNESS:

I did not grasp the question well.

Is it whether the trauma suffered in February 1962 added to the other traumata which she must necessarily suffer, because they are normal in her life as a wife, etc., all that, as a whole, has produced the herniated disc?

I can tell that said bruise on the back is not good for anybody.

"MR. HERNÁNDEZ:

She fell in a sitting position.

A bruise on the back is not good for anybody and it is possible that that is a contributory factor. I cannot say it affirmatively or deny it categorically.

Could you give us your opinion as to the manner in which the accident occurred? In other words, the impression on which you based the opinion you offered to my colleague that the trauma

appellee received was sufficient to produce this kind of herniated disc?

Of what you told me?

Of what you understand.

I understand that she was sitting in a car which was parked on Jobos Street. This lady was there with some children and when she received the impact from behind she fell forward and when she fell forward it was in a violent manner; she did not lose consciousness and then she felt pain in the lumbar region.

"MR. HERNÁNDEZ:

Immediately?

Immediately.

Did she say it was a violent blow?

"WITNESS:

Well, I did not ask her whether it had been an extraordinarily violent blow, but a violent blow, yes.

"MR. HERNÁNDEZ:

Did she give the impression that it had been a car which was parked and when somebody had tried to start it, it struck the car which was parked behind her and that in turn this car struck hers, or did she give the impression that she was parked and a car was coming and hit hers?

I cannot tell you because I did not ask her that question. All I know is that her car was parked and she was hit from behind. I do not know whether the car was running or not. That, I do not know.

"MR. HERNÁNDEZ:

Then, did she say that when she fell forward, how did she fall forward?

She went forward. Apparently she remained seated and she bent this way.

And that was where she felt the bruise?

Yes, sir."

(b) Note that Dr. Brinz was informed that the injured lady felt pain on her back immediately after the accident but she testified that said pains started a couple of hours later.

(c) Since the accident was not explained to Dr. Brinz in all details he was justified in basing his decision on the fact that the injured party's vehicle was violently struck, when apparently it was not so, since the repair of the damages only amounted to $54, and the car was apparently shaken, but it did not move much, since it did not touch the vehicle in front; the blow it received must have been considerably less than that received by the Volkswagen as a result of which the latter moved forward until it struck the injured party's Ford.

(d) Notwithstanding the accident and the pain of which she complains appellee has continued to work as secretary of a commercial enterprise. She admitted she danced, but not too much.

■ From the foregoing we conclude that the preponderance of the evidence did not establish that appellee was suffering from a herniated disc and that there was a causal relationship between said injury and the accident in this case. The diagnosis of fibromyositis, as explained and justified by Dr. Feliciano, seems to us the most reasonable and credible in the light of the nature and extent of the accident.

■ 3. In view of the foregoing we conclude that the fair and reasonable amount which should be granted to appellee for moral sufferings resulting from said injury caused by the accident is the amount of $2,000.

4. The imposition of attorney's fees will be reduced to $400.

The judgment of the Superior Court, Ponce Part, will be modified on said points, and as modified it will be affirmed.